UNITED STATES of America, Plaintiff,

v.

NATIONAL ASSOCIATION OF BROADCASTERS, Defendant.

Civ. A. No. 79–1549.

United States District Court, District of Columbia.

March 3, 1982.

Kenneth C. Anderson, Thomas L. Greaney, Gordon G. Stoner, Karen Magid, U. S. Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

William Simon, Keith E. Pugh, Jr., Edward P. Henneberry, Lynn I. Levine, Howrey & Simon, Erwin G. Krasnow, Brenda L. Fox, Nat. Ass'n of Broadcasters, Washington, D. C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

This action involves the application of the antitrust laws[1] to certain advertising standards adopted by the National Association of Broadcasters (NAB) for television networks and local television stations. The provisions under challenge in this lawsuit, *inter alia*, impose limitations upon the number of minutes per hour a network or station may allocate to commercials; the number of commercials which may be broadcast in an hour of television time; and the number of products which may be advertised on certain types of commercials.

Both parties have moved for summary judgment. In its motion, the NAB defends the provisions at issue as simple, voluntary guidelines which, in the public interest, set sensible limits on the commercialization of television. The government replies that the standards, far from serving the public interest, have as their actual purpose and effect the artificial manipulation of the supply of commercial television time, with the end result that the price of time is raised, to the detriment of both advertisers and the ultimate consumers of the products promoted on the air.

For the reasons elaborated on below, the Court concludes that none of the defenses asserted by NAB in support of the entry of summary judgment in its favor has merit. See Parts VI through IX *infra*. The government has presented persuasive arguments in support of its motion indicating that the NAB standards represent a broadcast industry combination which has the effect, and possibly the purpose, of raising the price of commercial time, and summary judgment will be entered in its favor as to one of the three sets of standards at issue. See Part V *infra*. Determination of the validity of the remaining two groups of standards must, however, await the presentation of evidence by the parties at trial. See Parts II through IV *infra*.

### I

The National Association of Broadcasters is an industry trade association whose membership includes the three major commercial television networks and over five hundred individual television stations. Since 1952, it has sponsored a Television Code[2] which provides broadcasters with guidelines

---

1. The action was filed pursuant to section 4 of the Sherman Act, 15 U.S.C. § 4, and it alleges violations of section 1 of that Act, 15 U.S.C. § 1. Section 1 provides in pertinent part that "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal."

2. Television Code of the National Association of Broadcasters (1978), as amended November 1978 (hereinafter referred to as NAB Code).

for meeting their statutory obligation to serve the public interest.[3] Any television station, whether or not a member of NAB, may subscribe to the Code.[4] In 1978, over 65 percent of all commercial television stations did so subscribe, and these stations accounted for an estimated 85 percent of all television viewing.[5] Subscribers are permitted to display the "NAB Television Seal of Good Practice."[6]

The NAB Code Authority is charged with enforcing the Code and monitoring subscriber compliance.[7] If found guilty, after a formal hearing, of violations of the Code, a subscriber may be suspended.[8] Alleged violations are investigated by the Television Code Board, and the final decision concerning suspension is made by NAB's Television Board of Directors. A suspended subscriber loses the right to display the seal of good practice.[9]

The Code includes a variety of standards governing television programming and advertising.[10] The government here charges that three types of advertising standards violate the antitrust laws.[11]

The first set of rules which are claimed to violate the law (referred to herein as the time standards) are those Code provisions which limit the amount of commercial material[12] which may be broadcast each hour.[13] The provisions limit network-affiliated stations to 9½ minutes of commercials per hour of prime time[14] (plus ½ minute for promotional announcements) and 16 minutes per hour at all other times. Independent stations are allowed more advertising time, and the amount of such material on children's programs also has a different time limit.

The second group of provisions under challenge (referred to herein as the program interruption standards) set a maximum limit on the number of commercial interruptions per program[15] as well as on the number of consecutive announcements per interruption.[16] In general, network-affiliated stations may interrupt prime time programs four times per hour; they may schedule a maximum of five announcements consecutively within an interruption (of which four may be commercial announcements); and they may schedule three announcements consecutively within each station break. Public service an-

---

**3.** See 47 U.S.C. §§ 307, 309.

**4.** NAB Code, Regulations & Procedures (hereinafter referred to as Regulations) III § 1. Subscription to the Code was mandatory for NAB members between April 1976 and February 1977.

**5.** NAB Comments before the Federal Trade Commission, *In the Matter of Proposed Trade Regulation Rule: Children's Advertising*, TRR No. 215–60, pp. 9–10.

**6.** Regulations III § 2.

**7.** Regulations VII. The Authority is headed by a general manager appointed by the president of NAB, subject to the approval of the NAB Board of Directors. Decisions of the general manager may be appealed to the Television Code Board, a group appointed by the president of NAB, subject to confirmation by the Television Board. Regulations VI.

**8.** Regulations III § 4.

**9.** Regulations III § 4.

**10.** Eight standards are devoted to programs; seven to advertising. In addition to the provisions at issue here, the advertising standards also deal with such subjects as deceptive advertising and certain representations concerning health and safety.

**11.** The complaint charges that NAB conspired with others to restrain trade in violation of the Sherman Act by agreeing to restrict the supply of advertising and by standardizing the format for the presentation of television commercials.

**12.** Other "non-program material," such as "billboards" and promotional announcements, is also included under these standards. NAB Code, Advertising Standards (hereinafter "Advertising Standards") XIV § 1; XV § 1.

**13.** See Advertising Standards XIV, §§ 2, 3; XV § 2.

**14.** Prime time is defined as any three consecutive hours between 6 p. m. and midnight designated by the station. Advertising Standards XIV § 2(A)(1), XV § 2.

**15.** Advertising Standards XIV § 4, XV § 3.

**16.** Advertising Standards XIV § 5, XV § 4.

nouncements do not count toward these limits.

The third Code provision challenged in this action (referred to herein as the multiple product standard) prohibits the advertising of two or more products or services in a single commercial if that commercial is less than sixty seconds in duration.[17]

■ In passing on the motions for summary judgment, the Court must determine, with respect to each of the three sets of Code provisions at issue, whether either party has established its entitlement to a judgment in its favor at this stage of the proceedings. If neither the government nor defendant can demonstrate such entitlement, a trial is required. Summary judgment may not be granted if there is a "genuine issue as to any material fact." Rule 56(c), Federal Rules of Civil Procedure. If material facts adequate to a final decision have not been developed or if the facts remain in dispute, summary judgment is inappropriate. See, *e.g.*, *Nixon v. Freeman*, 670 F.2d 346 at 362–363 (D.C.Cir. 1982); *Worthen Bank & Trust Co. v. National Bankamericard, Inc.*, 485 F.2d 119 (8th Cir. 1973); 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2725, p. 501 (1973).

■ Beyond that, the Supreme Court has cautioned that, because of the many novel and complicated circumstances that are typically involved in antitrust litigation, summary judgment should not readily be granted in such litigation. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Even in antitrust actions, however, summary judgment may be appropriate where, unlike in *Poller*, motive and intent are not centrally involved. *White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct.

696, 699–700, 9 L.Ed.2d 738 (1963); see generally, 2 P. Areeda & D. Turner, *Antitrust Law* § 316 (1978).

It is in light of these principles that the parties' motions for summary judgment must be evaluated.

## II

■ Section 1 of the Sherman Act applies only to agreements which are "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). Over the years, two types of analysis have been developed to determine whether an agreement fits this standard. These may be summarized, as the Supreme Court did in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978), as follows:

In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se*.' In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

In its motion, the government argues that the NAB Code provisions constitute a *per se* violation of the antitrust laws or, in the alternative, that they are unlawful under the broader reasonableness, or Rule of Reason, analysis. The Court will first consider the government's contention that the time standards and the program interruption standards *per se* violate the Sherman Act.[18]

---

**17.** Advertising Standards IX § 5. This prohibition does not apply if the commercial is "integrated so as to appear to the viewer as a single message."

**18.** Both the government and the defendant have in the main briefed the issues as if the three groups of Code provisions constituted a single entity. However, as will become clear from the discussion below, the multiple product

standard raises issues distinct from those presented by the time and program interruption standards. In this part of the opinion the Court considers the validity of the time and the program interruption standards under the *per se* doctrine; in Parts III and IV it evaluates these standards under the Rule of Reason; and in Part V it discusses the legality of the multiple product standard.

There is no question that the fixing of prices is illegal *per se*. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). This *per se* rule is not limited to agreements which fix price directly; it extends to any agreement which "interfere[s] with the setting of price by free market forces." *United States v. Container Corp. of America*, 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969); *United States v. Socony-Vacuum Oil Co., supra*, 310 U.S. at 221, 223, 60 S.Ct. at 843–844. Included under this rubric of *per se* illegality are agreements between competitors which limit the production or supply of a product, the obvious reason being that an artificial limitation on supply normally has a direct effect on price. See *United States v. Socony-Vacuum Oil Co., supra*; [19] *Hartford-Empire Co. v. United States*, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945); *United States v. Aluminum Co. of America*, 148 F.2d 416, 445 (2d Cir. 1945); *United States v. American Radiator and Standard Sanitary Corporation*, 433 F.2d 174 (3d Cir. 1970); *United States v. American Smelting & Refining Co.*, 182 F.Supp. 834 (S.D.N.Y.1960).

Relying upon these decisions, the government contends that, since the time and program interruption standards constitute an agreement limiting the supply of time for the broadcasting of commercial announcements, they fall squarely within the scope of the *per se* rule, and that judgment holding them to be violative of the antitrust laws should be entered without further inquiry. In the Court's view, such an approach is not justified with regard to these provisions.

*Per se* rules are based upon broad generalizations about the effect of certain commercial practices. *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 n. 16, 97 S.Ct. 2549, 2557 n. 16, 53 L.Ed.2d 568 (1977). They are designed to reach only those "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Because the *per se* approach does not allow the defendant to proffer explanations,[20] courts have been cautious in applying it, and the Supreme Court has in recent years emphasized the need for finding the requisite degree of perniciousness inherent in the challenged practice before judging it to be in the *per se* category. See *Continental T. V., Inc. v. GTE Sylvania Inc., supra*; *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

For these reasons, it is generally held that the *per se* approach should be employed only after a determination that the theoretical generalization underlying the rule would probably apply in fact to the particular agreement at issue. *United States v. Studiengesellschaft Kohle, M. B. H.*, 670 F.2d 1122 at 1129–1130 (D.C.Cir. 1981); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1363 (5th Cir. 1980); *Virginia Academy of Clinical Psychologists v. Blue Shield*, 624 F.2d 476, 484–85 (4th Cir. 1980). Thus, the *per se* rule against price fixing should be limited to situations where the effect of the challenged practice is

---

**19.** In *Socony-Vacuum*, the defendants limited the supply of oil by means of a special purchasing program. The Court stated that the effect of the supply limitation "was to place a floor under the market—a floor which served the function of increasing the stability and firmness of market prices," and it held the supply limitation to be an artificial manipulation of market prices condemned under the Sherman Act. 310 U.S. at 223, 60 S.Ct. at 844.

**20.** A *per se* rule "avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable." *Northern Pacific Railway Co. v. United States, supra*, 356 U.S. at p. 5, 78 S.Ct. at p. 518. Once an agreement is found to fall within the rule, it is conclusively presumed to be unreasonable and therefore unlawful.

to threaten the proper operation of our predominantly free-market economy—that is [if] the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... instead [of] one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–1563, 60 L.Ed.2d 1 (1979).

■ The necessary corollary to these principles is that the *per se* approach is inappropriate in industries which possess characteristics which appear to contradict the anticompetitive effect presumed by the rule. See, for example, *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, *supra*, 441 U.S. at 19–24, 99 S.Ct. at 1562–1564, where the Court carefully examined the music licensing market and, upon finding that it had special characteristics,[21] declined to apply the *per se* rule although price fixing was implicated in the licensing agreement at issue.[22] The *per se* approach has also been rejected where the industry in question was subject to government regulation, because such regulation might, again, endow the industry with special characteristics that could well affect the generalization underlying the *per se* rule. See *Silver v. New York Stock Exchange, supra; Jacobi v. Bache & Co.*, 520 F.2d 1231, 1237–39 (2d Cir. 1975).

■ The *per se* rule is thus inappropriate in a supply limitation case if the industry which is the subject of the litigation possesses attributes which in a fundamental way contradict the assumed link between supply and price that underlies the *per se* treatment of supply restrictions. See

note 52 *infra*. An examination of television broadcasting reveals that it possesses unusual characteristics which may be disruptive of that linkage.

In the first place, the broadcast media pose "unique and special problems" because they are "subject to an inherent physical limitation. Broadcast frequencies are a scarce resource; they must be portioned out among applicants." *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 101, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973). See also *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 388–89, 89 S.Ct. 1794, 1805–1806, 23 L.Ed.2d 371 (1969); *National Broadcasting Co. v. United States*, 319 U.S. 190, 226–27, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943).[23] There is also the somewhat related factor that, unlike most industries, broadcasting is faced with an absolute physical limitation on its product; there are, after all, only sixty minutes to each hour.[24] Like the absolute limit on the size of the broadcast spectrum, this factor is, at a minimum, an unusual complication to be taken account of in an antitrust analysis. Finally, the industry is subject to government regulation and, in order to retain their licenses, broadcasters must operate their stations in the "public interest." See note 3 *supra*; see also *Red Lion Broadcasting Co. v. FCC, supra*. Because of this public interest requirement, the amount of time which may be devoted to commercials and other non-program material is necessarily limited. See 47 C.F.R. § 0.281(a)(7) (1980), as amended 46 *Fed.Reg.* 13888 (1981); *In re WMOZ, Inc.*, 36 F.C.C. 201, 241 (1964).

These factors on their face appear to limit the free play of market forces in the broadcasting industry so that, even in the

---

**21.** *E.g.*, the need inherent in the operations of the business for rapid access to many compositions, the high cost of individual sales transactions, and the importance of monitoring to prevent the unauthorized use of compositions.

**22.** See also *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1181–82 (D.C.Cir.1978).

**23.** While these special problems have been articulated in a First Amendment context, they

are equally relevant to an antitrust analysis. An absolute limit on the number of competitors is, to some extent, inconsistent with the free market assumptions which underlie conventional antitrust analysis.

**24.** Because of the viewing habits of the public, prime broadcast time is likewise limited and probably not substantially capable of expansion.

absence of the Code, the supply of commercial time might not, or perhaps could not, expand in response to a high demand. Since it may well be that on this basis the supply of broadcast time does not result from the NAB Code but from unrelated factors, it would be improper to presume conclusively that the time and program interruption provisions have the effect on the price of commercial time which the *per se* rule seeks to prevent. In short, the *per se* rule is not logically, and hence not legally, applicable.[25] It follows that a broader inquiry than is possible under that rule is necessary to determine whether the time and program interruption standards actually have an anticompetitive effect. That analysis must and will be conducted under the Rule of Reason doctrine.

### III

■ The basic inquiry under the Rule of Reason[26] is "whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Society of Professional Engineers v. United States, supra,* 435 U.S. at p. 691, 98 S.Ct. at p. 1365. See also *White Motor Co. v. United States, supra,* 372 U.S. at pp. 261–62, 83 S.Ct. at pp. 700–701; *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). In making this determination, the Court must examine all the evidence regarding the impact

of the agreement upon competition, including "facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." *Chicago Board of Trade v. United States, supra,* 246 U.S. at p. 238, 38 S.Ct. at p. 244. Facts concerning the history and purpose of the agreement are also relevant because they may assist the court in determining its probable effect.

In considering the effect[27] of the Code on competition, it is necessary to consider the two[28] sets of standards separately.

■ The time standards of the NAB Code (see pp. 153–154 *supra*) will not survive a Rule of Reason analysis if it is determined that they have the anticompetitive effect of raising or stabilizing the price of commercial time. In an inquiry somewhat similar to that required by the *per se* rule,[29] the Court must ascertain whether it is the limitations imposed by these Code provisions which actually affect the supply of commercial time or whether supply is otherwise determined.[30] Should it be found that the Code does limit supply, it must still be determined what effect that limitation may have on the price of commercial time. If the effect of the Code on price is *de minimis,* that is, if price is set essentially by other factors—*e.g.,* the type of program-

**25.** Of course, as discussed below, if on the basis of a complete analysis of all the relevant factors, it is determined that the supply restrictions are, in fact, the product of the NAB Code, the challenged practices may properly be enjoined.

**26.** The Rule of Reason dates back to the common law and has been a cornerstone of Sherman Act analysis since 1898. See *National Society of Professional Engineers v. United States, supra,* 435 U.S. at pp. 688–91, 98 S.Ct. at pp. 1363–1365.

**27.** The question of purpose is explored in Part VII *infra.*

**28.** The multiple product standard presents different problems and is discussed in Part V *infra.*

**29.** There is, however, a distinction between the purposes for which the inquiry is conducted in

a *per se* analysis and those which underlie the Rule of Reason analysis. In rejecting the *per se* approach, the Court determined only that, in this industry context, the Code provisions are not the sort of arrangement properly invalidated *per se* because the actual effect of the Code upon the supply of commercial time is unclear. Under the Rule of Reason, the Court must ascertain the actual effect of the Code provisions and uphold or invalidate them depending upon whether that effect is factually anticompetitive.

**30.** In making that determination, it is appropriate to consider factors not unlike those involved in deciding whether the *per se* rule applies; *i.e.,* what inherent limits there are on the amount of commercial time available and the limitations on the amount of such time resulting from FCC regulation.

ming, the day of the week and the time of day a program is broadcast, the size of the audience and its demographics, the marketing strategy of the particular advertiser, the placement of the advertisement vis-a-vis other non-program material, the limit on the number of broadcast stations—the Code will not be regarded as violative of the Sherman Act.[31] On the other hand, the Code will not survive antitrust scrutiny if it has an effect on price that is more than *de minimis* even if other, neutral factors also determine or affect price.

Whatever may be the ultimate conclusion on these questions, it is clear that the extent to which the supply and the price of commercial time are influenced by the NAB Code is a disputed issue of material fact.[32]

That issue cannot be resolved on summary judgment but must be determined by the normal fact finding process of a trial.[33] The government's motion for summary judgment on the time standards must therefore be denied.

## IV

Likewise requiring a trial are the program interruption standards, that is, those Code provisions which limit the number of times a program may be interrupted for commercials and the number of consecutive commercials permitted within each interruption. The government contends that these provisions standardize the placement and length of commercials and that in so doing they eliminate important forms of

**31.** The Court must inquire whether the effect on competition is "substantially adverse." *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 1863–1864, 18 L.Ed.2d 1249 (1967), *overruled on other grounds, Continental T.V., Inc. v. GTE Sylvania, Inc.*, supra. See also, *Neeld v. National Hockey League*, 594 F.2d 1297, 1300 (9th Cir. 1979); *Smith v. Pro Football, Inc.*, supra, 593 F.2d at 1183 ("significantly anticompetitive"); L. Sullivan, *Antitrust* § 68, p. 187 (1977).

**32.** In support of its position on this issue, the government relies on such materials as the 1963 testimony of Peter Kenney, vice president of NBC, and that of Mark Evans, vice president of Metromedia, who indicated that the amount of time available for commercials governs the rates (*Broadcast Advertising: Hearings on H.R. 8316, 8381, 8729, 8896, 8980, 9042 Before the Subcomm. on Communications and Power of the House Committee on Interstate and Foreign Commerce*, 88th Cong., 1st Sess., 116, 301 (1963)) as well as on NAB's own statements that the advertising restrictions have an impact on price. See, *e.g.*, Comments of the National Association of Broadcasters, *In the Matter of Amendment of Part 3 of the Commission's Rules and Regulations with Respect to Advertising on Standard, FM, and Television Broadcast Stations*, Docket No. 15083, Sept. 30, 1963, p. 26. The FCC likewise believes that the Code limitations affect the price of commercial time. Letter from Charles Ferris, Exhibit A to Supplemental Reply of Defendant, at p. 7. See also pp. 165–166 *infra*.

On the other hand, although counsel for NAB has conceded that the Code has an effect on price (Transcript of Dec. 5, 1979 Hearing, p. 7), defendant's claim is that "everything has an impact on price," and that the Code has such

an effect only in the way that every commercial contract, in one sense, imposes a restraint on commercial freedom. Defendant's Supplemental Reply Memorandum, p. 6.

**33.** The parties will be expected at trial to produce specific proof concerning the effect of the Code provisions on the supply of that time and the relationship between the supply of commercial time and its price. The government might seek to discharge its burden of proving, for example, that there is a relationship between the supply limitations inherent in the Code's time standards and the price of commercial time by adducing evidence which tends to show that the price non-subscribing stations charge for equivalent blocs of time is lower than that charged by Code subscribers. The government might also provide the Court with additional evidence regarding the Code's impact upon the television advertising market. Defendant, for its part, might attempt to prove that it is the special characteristics of the broadcast industry, not the Code, which restrict the supply of commercial time, by demonstrating, for example, that stations which do not subscribe devote the same amount of time to commercials as do subscribers. Defendant might also attempt to show that the demand for commercial time is so high that any restriction upon its supply caused by the Code provisions has no effect upon price.

Needless to say, these examples are only illustrative. They are not meant as directives to the parties nor will they bind the Court when the evidence is adduced. Each party will decide for itself how to present its case, and only after the Court has heard the evidence will it be able properly to assess the competitive effect of these Code provisions.

competition among networks and stations both for advertisers and for viewers.[34]

■ Depending upon their nature, agreements between horizontal competitors to standardize their products may either increase competition or they may hinder it. On the one hand, the interchangeable nature of standardized products permits consumers more readily to take advantage of price differences among competitors;[35] on the other, it is easier for competitors to fix prices when their products are identical: all that is necessary is an exchange of price information.

The dual nature of standardization agreements has long been recognized. Their likely effect, and hence their status under the antitrust laws, has been said to depend upon a variety of factors, such as the type of product involved, the structure of the industry, and the presence or absence of other anticompetitive activity therein. If, on a balance of these factors, an agreement increases price competition, it is upheld; if it facilitates price coordination, it is rejected. *C–O–Two Fire Equipment Co. v. United States*, 197 F.2d 489 (9th Cir. 1952); *Bond Crown & Cork Co. v. FTC*, 176 F.2d 974 (4th Cir. 1949); *Tag Manufacturers Inst. v. FTC*, 174 F.2d 452 (1st Cir. 1949); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F.Supp. 1100, 1153–54 (E.D.Pa. 1981); L. Sullivan, *Antitrust, supra*, § 98.[36]

■ Although one may well speculate that the program interruption rules, particularly when combined with the time standards, do, in fact, foster a standard station format,[37] it is not possible on the basis of the meager record before the Court to make a definitive judgment in that regard. Beyond that, neither the government nor the defendant has presented any significant information regarding the likely economic effects of standardization in this instance. A decision on the issues which will govern the validity of the program interruption standards must therefore also await the presentation of evidence at a trial.[38]

## V

■ Different considerations dictate a different result with regard to the multiple product standard. That standard prohibits the advertisement of more than one product in a commercial lasting less than sixty seconds.[39] It is apparent from the face of

---

**34.** NAB has not directly addressed the standardization point.

**35.** For example, if two plywood manufacturers agreed upon standards for the different types of plywood they produce, a consumer interested in a specific type of wood would be able easily to compare the manufacturers' prices and choose the least expensive brand.

**36.** It is important to recognize that this action does not represent a complaint by a competitor that an industry established by its other competitors has adversely affected its product. See, *e.g., Structural Laminates, Inc. v. Douglas Fir Plywood Ass'n*, 261 F.Supp. 154 (D.Or. 1966), *aff'd per curiam*, 399 F.2d 155 (9th Cir. 1968). Rather, it is alleged in this case that the standardization agreement adversely affects the customers of television stations that is, their advertisers and viewers.

**37.** For example, under the Code a station could probably not choose to designate one hour as commercial-free, moving additional commercials to another hour in the broadcast day. Similarly, it would be difficult for an independent station to broadcast a sixty-minute program during prime time with only a single interruption for commercials while still selling the maximum amount of time permitted by the time standards. An independent station may broadcast fourteen minutes of commercials in sixty minutes of prime time, but only seven commercials may be broadcast during any single interruption. Advertising Standards, XV §§ 2, 4. Thus, each commercial would have to be atypically long, two minutes, in order for the station to sell the maximum amount of commercial time permitted by the Code. Similar difficulties may be encountered with respect to programs of different lengths and those broadcast in non-prime time. (Network-affiliated stations are apparently not subject to this limitation. Regulations XIV § 5.) It might be possible in theory for a station to sell fewer commercials and charge a higher price, but the Code appears to preclude some of the stations' options in this regard and to foster a standard arrangement.

**38.** See *Nixon v. Freeman, supra*.

**39.** Advertising Standards, IX § 5. The Code further provides that this provision does not apply if the commercials are "integrated so as to appear to the viewer as a single message."

this standard that it has the effect of compelling some, perhaps many, advertisers to purchase more commercial time than their economic interests might dictate. In thus artificially increasing the demand for commercial time—and perhaps limiting its supply as well (see *infra*)—the standard raises both the price of time and the revenues of the broadcasters, to the detriment of the users of the broadcast medium and the consumers of their products.

An advertiser is not free, under the multiple product standard, to purchase one thirty-second spot to advertise two products; if he wishes to promote more than one item, he must purchase at least sixty seconds of time—twice as much as he may actually want or need. The distinction is by no means trivial, just as the difference in cost between a single thirty-second spot and a sixty-second spot is not: on a highly-rated network program it can apparently run into well over $100,000.[40] Translated into lengthy advertising campaigns, that difference might conceivably add up to millions of dollars in revenues to the broadcasters and in costs to the advertisers—and indirectly to the consumers of the products these advertisers sell.

The burden of this standard falls especially heavily upon smaller enterprises. A relatively small business which is able to promote one successful product in a series of thirty-second commercials is precluded by the standard from using any portion of that thirty seconds to launch a second product the sales of which will not, or not yet, support a commercial of its own.[41] Yet its larger competitor, with the resources to purchase sixty seconds of time, is free to use any part of that period to advertise a number of different products (some of which may be in direct competition with the smaller firm's product kept off the air by NAB's rule). For a discussion of NAB's defense of this policy, see note 73 *infra*.

The history of the standard bears out the conclusion that its effect is anticompetitive.[42] In 1964, NAB considered a proposal to prohibit "piggyback" commercials.[43] Various advertisers objected on economic grounds,[44] and, instead of an outright ban on piggybacks, NAB adopted the present standard. There again were protests, some claiming illegality under the Sherman Act, but the standard has remained in effect.

The multiple product standard may be regarded as an artificial device to enhance the demand for commercial time, as a means to limit the supply of such time,[45] or as a practice akin to a tying arrangement. Regardless of the label that is applied, the provision *per se* violates the antitrust laws.

Retail and service establishments are exempt from this provision.

40. N.Y. Times, Dec. 8, 1981, § 4 at p. 24 col. 3; *id.*, Jan. 29, 1980, § 4, at p. 16 col. 4.

41. The commercial would be acceptable only if it was "integrated" so as to fall into the exception to this rule. See note 39, *supra*.

42. NAB claims that the Court may not rely upon some of the documentary evidence submitted by the government. See Defendant's Supplemental Reply Brief at p. 29 n. 44. None of these exhibits provide information crucial to the Court's decision. They are discussed only to illuminate that decision by providing examples, and to give guidance to the parties in their preparation for trial. See also note 40, *supra*; notes 43–44, *infra*; pp. 165–166 *infra*.

43. Piggybacks are advertisements containing messages for two or more products in a single commercial.

44. The chief counsel of Helene Curtis Industries, Inc. stated that the proposal would penalize the small television advertiser, and the president of Alberto-Culver Company likewise noted that it would end the participation of many small advertisers in the medium. The Alberto-Culver witness further commented that multiproduct commercials permit an advertiser to use an already profitable product to support much of the expense of introducing a new product, and he unfavorably compared the piggyback rule with newspaper and magazine practice (which do not require advertisers to restrict their advertisements to a single product).

45. The government has labelled all of the Code provisions at issue in this case as supply restrictions. Plaintiff's Memorandum in Opposition to Motion to Dismiss at pp. 157–158.

The standard, as indicated *supra*, is an artificial rule, adopted by the broadcasters acting in concert, which requires advertisers to purchase more commercial television time than they might wish and in excess of what they would be able to purchase if free market conditions prevailed.[46] Its effect on a single advertiser is to increase his demand for commercial time, and its overall effect on broadcast industry-advertising industry relations is to enhance the aggregate demand for such time.

On this basis, the multiple product standard bears a strong conceptual resemblance to the agreement involved in *National Macaroni Manufacturers Ass'n v. FTC*, 345 F.2d 421 (7th Cir. 1965). In that case, manufacturers agreed upon a standard formula for the ingredients to be used in their macaroni and spaghetti products. The court found that the agreement had the purpose and effect of depressing demand for, and there-fore the price of, durum wheat (a raw material used in the manufacture of macaroni and spaghetti), and it held such a standardization agreement to constitute a *per se* violation of the antitrust laws.[47]

Defendant has presented no valid reasons for not applying the *per se* rule of *National Macaroni* in this case,[48] and none occurs to the Court. The agreement there fixed the composition of the members' product so as to reduce the demand for, and therefore the price of, a raw material they were using. The agreement here prescribes a rule for subscribers which necessarily has the effect of increasing the demand for, and therefore the price of, commercial time. The result is the same,[49] and so are the legal consequences.[50]

Nor does the reasoning which led the Court to decline in Part III *supra* to hold that the *per se* rule does not apply to the

**46.** In a free market, absent the NAB Code, there would be no obstacle to the promotion by an advertiser of several of his products in a shorter, and necessarily less expensive, period of time.

**47.** Agreements affecting demand fall within the *per se* rule against price fixing for the same reasons as agreements artificially affecting supply: absent special circumstances, both "interfere with the setting of price by free market forces." *United States v. Container Corp. of America, supra*, 393 U.S. at p. 337, 89 S.Ct. at p. 512. See pp. 154–155, *supra*.

**48.** Defendant would distinguish *National Macaroni* on three bases. It argues, first, that the court in that case found both an anticompetitive purpose and an anticompetitive effect. Subsequent decisional law establishes that only one of these is necessary for an antitrust violation. See Part VII *infra*. Second, defendant asserts that the Code is not broadly applicable. However, it is clear that the NAB Code has the same dominance in the broadcasting industry that the trade association agreement had in *National Macaroni*. Code subscribers have eighty-five percent of the television viewers in the United States, and in addition, as NAB has conceded, the Code has a significant spillover effect which causes many non-subscribers to adhere to its provisions. NAB Comments before the Federal Trade Commission, *In the Matter of Proposed Trade Regulation Rule: Children's Advertising, supra*, at p. 10; Testimony of Stockton Helffrich before the Federal Communications Commission, *In the Matter of a Petition of Action for Children's Television*, Docket No. 19143, at p. 709. Third, defendant claims that the Code has procompetitive effects in that the supposed alternative—government regulation—would apply to all television stations while the Code applies only to subscribers. But if Congress chose to impose standards, either directly or through the Federal Communications Commission, compliance with the congressional directive would obviously not be an antitrust violation. In any event, the agreement's procompetitive effects must be assessed by examining the state of the industry in the absence of the challenged agreement rather than on the basis of hypotheticals.

**49.** To be sure, in *National Macaroni* it was the defendants' demand for products that was being affected by the offending practice while in the instant case it is the demand of third parties. But as the discussion of tying arrangements *infra* demonstrates, in appropriate circumstances the antitrust laws are violated in the latter situation as well as the former.

**50.** Manufacturers and other sellers may obviously use advertising and other forms of persuasion to increase the demand for their products, and they might even be free to do so on the basis of concerted action. But the multiple product standard is not a form of persuasion but a coercive device which leaves an advertiser with no option with respect to his demand for commercial time: if he desires to promote more than one product he must increase his demand for such time to sixty seconds per commercial announcement.

Code's time standards help the defendant on this aspect of the case. As indicated above, it is possible that the intrinsic characteristics of the broadcasting industry rather than the Code's time standards are instrumental in limiting the overall supply of commercial time, and for that reason these standards might not be found to have the specific effect on supply that is presumed by the general rule against supply restrictions. But the industry's characteristics are not relevant to the *National Macaroni* principle; the only significant consideration under the branch of the *per se* rule it represents is whether the agreement tampers with demand. Demand results directly from advertisers' need for commercial time; their need for time is not affected by various inherent limits on broadcast time or governmental rules against overcommercialization. Even when supply remains constant, it is clear that, in a free market, an increase in demand will lead to an increase in price.

If the multiple product standard is viewed as a supply limitation, on the theory that it limits the number of commercials possible in a given amount of time, the same result obtains. For the reasons cited above, the total supply of commercial time may be presumed to be limited, as a consequence either of the special characteristics of the industry, or of the Code's time standards, or both. Upon this limited amount of time the television broadcasters have imposed through NAB an additional restriction in the form of the multiple product standard. That standard makes commercial time available to the advertisers in such a manner, *i.e.*, in segments of a particular size, as to reduce the supply of time even further.[51] When producers combine to impose a rule that so limits supply they artifi-

cially inflate price and act *per se* in an anticompetitive manner. See p. 155 *supra*.[52]

Finally, as indicated above, the multiple product standard is in significant respects analogous to the practice of tying—also a *per se* violation of the Sherman Act. *Northern Pacific Railway Co. v. United States, supra*. See generally, L. Sullivan, *Antitrust, supra*, at §§ 150–162. Tying occurs when a seller requires purchasers of one product to purchase also a second product which the purchaser does not or may not want. The rationale of the prohibition against tying is that it

> den[ies] competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. . . . [B]uyers are forced to forego their free choice between competing products.

*Northern Pacific Railway Co. v. United States, supra*, 356 U.S. at 6, 78 S.Ct. at 518.

The tying cases, to be sure, are not technically applicable in this instance because the additional amount of commercial time advertisers are required to purchase under the multiple product standard does not represent a "different product" from the time the advertisers actually desire to purchase.[53] However, the rationale underlying the rule against tying—that sellers should be precluded from using their market power to force a buyer to purchase and to pay for something he does not want—applies precisely in this case. NAB has used its dominance in the television industry to require companies who desire to advertise more than one product on television to buy more than they wish to purchase. Thus, the coercive use of market power to restrict buyers' decision-making which is at the heart of

51. The effect, if any, of the special characteristics of the industry would be to reduce the *total* supply of commercial time. These characteristics do not impact upon the operation of a rule which further reduces the availability of this supply to consumers.

52. Even in an industry with unusual or special characteristics, a court is not precluded from

finding a *per se* violation where, as here, the practice under scrutiny is itself clearly anticompetitive and where, again as here, the industry's features do not vitiate the anticompetitive effect.

53. See L. Sullivan, *Antitrust, supra*, at § 155.

tying is also present in the provision at issue here. See P. Areeda, *Antitrust Analysis* ¶ 541 (1981).[54]

The Court concludes that for these reasons, both individually and on the basis of their interrelationship, NAB's multiple product standard falls within the *per se* rule and is violative of the Sherman Act. It follows that the conduct it represents must conclusively be presumed to be unreasonable, and defenses available in a Rule of Reason context (Parts VI through IX) are foreclosed. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., supra,* 441 U.S. at 8, 99 S.Ct. at 1556; *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 211–12, 79 S.Ct. 705, 708–709, 3 L.Ed.2d 741 (1959); *Northern Pacific Railway Co. v. United States, supra,* 356 U.S. at 5, 78 S.Ct. at 518.

### VI

The first defense upon which NAB relies is that the Code is voluntary, in the sense that no one is compelled to join and allegedly no sanctions are imposed for a violation. The voluntariness argument has several facets.

Initially, defendant contends that, because subscription to the Code is voluntary, it is not the kind of "contract, combination . . . or conspiracy" that is contemplated by section 1 of the Sherman Act. This jurisdictional argument wholly lacks merit. The NAB Code is an agreement among competing television networks and stations, and it restricts the availability of one of the principal services these competitors offer—the broadcasting of commercial announcements.

As such, it is the classical horizontal agreement which the Sherman Act was designed to reach, and it is a "contract" within the meaning of that statute. *United States v. National Association of Real Estate Boards,* 339 U.S. 485, 488–89, 70 S.Ct. 711, 713–714, 94 L.Ed. 1007 (1950).[55]

But, says defendant, because of its voluntary character, the Code is at a minimum a "reasonable" restraint on competition and therefore not violative of the law.

Although there appear to be no decisions directly addressing the question whether the voluntary character of an agreement may be taken into account in determining the reasonableness of a particular combination, it is well established that the parties to an agreement which *per se* violates the antitrust laws may not defend on the basis that they have applied no coercion to bring about adherence to the combination or to compel obedience to its terms. *American Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921); *National Macaroni Manufacturers Association v. FTC, supra.* As the Court said in *United States v. National Association of Real Estate Boards, supra,* 339 U.S. at 488–89, 70 S.Ct. at 714:

> The Board's code of ethics provides that 'Brokers should maintain the standard rates of commission adopted by the board and no business should be solicited at lower rates.' Members agree to abide by this code. The prescribed rates are used in the great majority of transactions, although in exceptional situations a lower charge is made. But departure from the prescribed rates has not caused the Wash-

---

**54.** The antitrust laws might not prohibit an individual television station from requiring advertisers to purchase a minimum amount of time, for such a requirement, to the extent that it is unreasonable, could be rectified by market forces. NAB's concerted action prevents these market forces from operating.

**55.** Defendant cites a number of cases to the contrary but none of these supports its position. In *United States v. American Society of Anesthesiologists, Inc.,* 473 F.Supp. 147 (S.D.N.Y.1979), the court held only that the government had failed to show that the Society's fee guide fixed prices or otherwise had an anticompetitive effect, and, indeed, in order to reach that conclusion, it necessarily had to find first that the guide was an agreement under the Sherman Act. In the two other decisions cited by defendant—*Tropic Film Corp. v. Paramount Pictures Corp.,* 319 F.Supp. 1247 (S.D.N.Y. 1970) and *Hughes Tool Co. v. Motion Picture Ass'n of America,* 66 F.Supp. 1006 (S.D.N.Y. 1946)—the issue was whether the agreement constituted a group boycott, not whether it failed to satisfy the statute's jurisdictional requirement.

ington Board to invoke any sanctions. Hence the District Court called the rate schedules 'nonmandatory.' ... [T]he fact that no penalties are imposed for deviations from the price schedules is not material.... Subtle influences may be just as effective as the threat or use of formal sanctions to hold people in line.

Logic and experience would seem to dictate that the same principle should apply in the context of a Rule of Reason analysis. As indicated *supra,* the Sherman Act was designed to reach all anticompetitive concerted action by competitors, whether accomplished by an express, legally-enforceable contractual obligation or by more subtle means. See *United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 309–10, 76 S.Ct. 937, 939–940, 100 L.Ed. 1209 (1956).[56] It is, indeed, difficult to see why legal unenforceability or lack of formal sanctions should be considered a valid defense. Combinations of entities which fix prices, manipulate supplies, or engage in other anticompetitive conduct are almost always "voluntary" in the sense that a recalcitrant co-conspirator cannot be required, in a court of law, to keep his bargain. But that lack of legally-enforceable coercion—needless to say—does not establish a defense under the antitrust laws.

It is not necessary to resolve that legal question, however, because the documents submitted by the government, coupled with defendant's failure to respond, require a decision in favor of the former on factual grounds.[57]

The government's documents show that the NAB Code is not a mere set of advisory standards which subscribers may choose to ignore[58] but a contractual arrangement to which they are obligated to adhere.[59] This obligation does not exist merely on paper: NAB administers a comprehensive monitoring and enforcement program,[60] and its officials have stated that the threat of disciplinary action is effective in maintaining Code compliance:

> [T]he mere fact that we have that power to threaten to drop people from the Code has its own inhibiting value.... [A station] would rather not be known as someone bucking what appears to be a good system. So [the Code] tends to operate to get it into line.[61]

If anything, this comment tends to understate the effectiveness of the Code; its influence is so pervasive that in real terms it stands between the nation's airwaves and even the most powerful business enterprise. As NAB itself has said in another forum, "national advertisers need to insure that commercials are Code compliant *in order to*

---

**56.** It might be relevant to the reasonableness issue that the agreed-upon standard was advisory rather than mandatory, in the sense that the parties to the agreement did not promise to abide by its terms and that violation is not penalized in any way. See *United States v. American Society of Anesthesiologists, supra.* The NAB Code clearly cannot be classified as advisory. See notes 59–62 and accompanying text, *infra.*

**57.** To put it another way, there is on this question no genuine issue of material fact.

**58.** See note 56 *supra.*

**59.** Regulations III.

**60.** These tasks are carried out by the Code Authority which has an annual budget of approximately $770,000. It checks stations' adherence to the Code by examining copies of their program logs on a random basis for one or two five-day periods each year. Detailed

reports of the results of this monitoring are compiled and they are discussed at meetings of the NAB Television Code Board. See Exhibits 1–4 to Plaintiff's Supplemental Brief. Subscribers who fail to observe the Code's requirements are subject to disciplinary proceedings and, if found in "continuing, willful or gross violation," they lose the right to display the NAB Television Seal of Good Practice. Regulations III § 4.

**61.** Testimony of Stockton Helffrich before the Federal Communications Commission, *In the Matter of Petition of Action for Children's Television, supra,* at p. 710. A survey conducted by NAB in 1965 found that a substantial number of advertisers were interested in knowing whether a station on which they intended to advertise was a Code subscriber and that some preferred to advertise on stations which subscribed to the Code. Exhibit 15 to Plaintiff's Supplemental Brief.

*gain access to the networks*" (emphasis added).[62]

Defendant has not contradicted these specific facts but is content to rely on conclusory statements to the effect that the Code is "voluntary."[63] Such general statements are insufficient to establish an issue of fact under Rule 56(e), Federal Rules of Civil Procedure.

The NAB Code is supported by a more structured enforcement program and more visible sanctions than the usual anticompetitive agreement,[64] and the defense based on its allegedly voluntary character must be rejected.[65]

## VII

NAB argues next that the government had a duty to show that the Code was formulated with an anticompetitive purpose and that its failure to do so is fatal to its case. That argument is not well taken, for two independent reasons.

In *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 n. 13, 98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854 (1978), the Supreme Court stated that under the Sherman Act "a civil violation can be established by proof of *either* an unlawful purpose *or* an anticompetitive effect" (emphasis added).[66] See also, *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 243, 100 S.Ct. 502, 509–510, 62 L.Ed.2d 441 (1980). Thus, the government's failure, at this stage,[67] to establish that NAB acted with an anticompetitive purpose, would not *ipso facto* entitle NAB to summary judgment: the government could prevail in this action by showing simply that the Code has an anticompetitive effect.[68] And, as the previous discussion demonstrates, NAB has not established that there are no facts from which the Court could find that such an effect is present.

Defendant could not prevail on its motion even if anticompetitive purpose were a necessary element of the government's proof, for on the record before the Court there is a genuine dispute of material fact on that question.

The government's evidence includes the following. First. NAB's own *Manual for Self-Regulation* states that, by serving the public interest, self-regulation "advances the reasonable self-interest of broadcasters. It directly backstops sales departments' revenue producing. It provides 'insurance' in that it is a basic defense of licensees profit and loss sheets." See also, note 44 *supra*. Second. The time and clutter rules for network affiliates differ from those which apply to independent stations, and different rules apply to the more lucrative prime time hours than to the financially less re-

---

**62.** NAB Comments before the Federal Trade Commission, *In the Matter of Proposed Trade Regulation Rule: Children's Advertising, supra*, at p. 10.

**63.** NAB also cites two reports, one by the Attorney General and one by the Federal Communications Commission, but both of these, too, merely state in conclusory terms that the Code is ineffective. The Commission has twice found the Code sufficiently effective to decline to issue regulations concerning subjects it governs. See *Children's Television Report and Policy Statement*, 50 F.C.C.2d 1, 13 (1974); *Report and Order*, 36 F.C.C. 45, 50 (1964).

**64.** A similar conclusion was reached in *Writers Guild of America, West, Inc. v. FCC*, 423 F.Supp. 1064, 1123–25 (C.D.Cal.1976), *rev'd on other grounds*, 609 F.2d 355 (9th Cir. 1979), in which the court, in another context, characterized the Code as a "joint attempt to monopolize the nation's airwaves." 423 F.Supp. at 1143.

**65.** NAB may introduce proof on this question at trial if it advances a credible legal theory demonstrating the relevance of such proof to the reasonableness of the two types of Code provisions which will be the subject of that trial.

**66.** The Court's only reservation was that "consideration of intent may play an important role in divining the actual nature and effect of the alleged anticompetitive conduct." *Id.* To the same effect, see *Foster v. Maryland State Savings and Loan Ass'n*, 590 F.2d 928, 936 n. 3 (D.C.Cir.1978) (Leventhal, J. concurring).

**67.** As the case will go to trial, the government may, of course, offer proof of such purpose.

**68.** Defendant relies to the contrary upon *AFTRA v. NAB*, 407 F.Supp. 900 (S.D.N.Y.1976), but that case predates the Supreme Court's opinion in *Gypsum.*

warding daytime and nighttime viewing periods.[69] Third. Code officials have stated that "the 80-second break provides [certain broadcasters] with better revenue possibilities than does a 70-second break"; that a recommended reduction in prime time offers "obvious revenue opportunities for all"; and that certain proposed time standards "should alleviate the economic discomfort of most Code stations now concerned over present commercial allocations."[70]

To counter this evidence, NAB has presented affidavits from its officials indicating that the various Code standards had no purpose other than the avoidance of excessive commercial advertising in the interest of the viewing audience, and that competitive considerations did not enter into their adoption.[71] Whatever weight may be given to these statements, they certainly cannot be deemed conclusive. There is thus at least a dispute on NAB's purpose, summary judgment is inappropriate,[72] and the question will have to be decided after a trial.

## VIII

NAB argues at great length and with considerable vigor that there is a public interest in preventing the overcommercialization of television and that this interest should be given substantial weight in the evaluation of the Code's reasonableness under the antitrust laws. Specifically, NAB reasons that if the time limitation standards of the Code were struck down, the inevitable consequence would be either a substantial increase in the television time allotted to commercials or regulatory action by the Federal Communications Commission to take the place of NAB's self-regulation, and that neither alternative is desirable as a matter of public policy.[73] There are two principal branches to the government's response.

Factually, the government urges the following. Because of the competition that is likely to accompany the elimination of the standard Code provisions, it is unlikely that the television networks and stations would find it to their business advantage to reduce regular program time in favor of additional or longer commercial interruptions. This

69. It would not be unreasonable, at least, *prima facie*, to conclude from the broadcasters' desire to tailor their Code to the economic circumstances of the various members and the relative financial rewards to be gained in various time periods that competitive concerns govern Code decisions.

70. Memoranda from Code Authority Staff dated June 10, 1963 and June 24, 1963. Exhibits 18 and 19 to Plaintiff's Supplemental Brief.

71. See, *e.g.*, affidavits of Howard H. Bell, former director of the NAB Code Authority, and William H. Tankersley, former member of the NAB Television Code Review Board. Exhibits A, B to Defendant's Supplemental Brief. Mr. Bell has also stated that the "question of rates has never been a consideration in the adoption of Code policies and standards." Letter from Mr. Bell to E. William Henry, Chairman of the FCC dated December 1, 1965.

72. *Poller v. Columbia Broadcasting System, Inc., supra.*

73. The program interruption standards and the multiple product standard are said to be in the public interest because they prevent "clutter," *i.e.*, "the practice of scheduling an excessive number of separate non-program announcements consecutively within a single interruption as well as ... an excessive number of program interruptions." *National Society of Professional Engineers v. United States, supra* is as decisive on this subject as it is in regard to defendant's other public interest arguments (and, as noted in Part V *supra*, the multiple product standard is not subject to challenge in any event).

Moreover, any basis for NAB's "clutter" defense is undermined by NAB's policy of restricting those able to purchase less than sixty seconds of commercial time to the promotion of a single product while, as far as the record before the Court shows, the purchaser of sixty seconds of time is permitted to advertise four, five, or six products during that period. No more clutter is produced by a thirty-second commercial which promotes two products than by a sixty-second commercial which advertises four products. Yet under the multiple product standard the latter is permitted, the former is forbidden. Clutter may well be undesirable; but it is most effectively dealt with, not by an agreement among the broadcasters which maximizes their financial gain, but by market forces which, by penalizing those whose commercial announcements offend the public, impartially reduce all clutter on an equal basis.

pressure to hold down the length and improper placement of commercials will be further strengthened by the emergence of new technologies (*e.g.*, satellites) and the proliferation of new entertainment sources (*e.g.*, cable, videotape). Thus, competition may be expected to be at least as effective in curbing the overcommercialization of television as is the NAB Code. Should these expectations prove to be erroneous, either generally or in the short run, the safety valve of "neutral" regulation by the FCC— as distinguished from the economically-interested regulation by NAB—would remain available.

It is not necessary for the Court to speculate on the accuracy of either party's set of predictions, for the government's second response, which rests on settled Supreme Court precedent, is conclusive.

In *National Society of Professional Engineers v. United States, supra,* it was claimed by the society that a declaration of invalidity under the antitrust laws of its rule barring members from engaging in competitive bidding would entail such consequences inimical to the public interest as cost-cutting and poor workmanship. The Court held that these consequences, even if they could be established, were irrelevant under the antitrust laws. The Judiciary, said the Supreme Court, must confine its analysis solely to the "competitive significance" of a challenged practice; it "is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry . . . . [T]hat policy decision has been made by the Congress." *Id.* 435 U.S. at p. 692, 98 S.Ct. at p. 1365 (footnote omitted). See also *Smith v. Pro Football, Inc., supra,* 593 F.2d at pp. 1186–87.[74]

Justice Rehnquist, dissenting on other grounds in *Community Communications Co. v. City of Boulder,* —— U.S. ——, ——, 102 S.Ct. 835, 846, 70 L.Ed.2d 810 (1982) has recently restated the applicable law in language which, with but slight modifications to take account of the different facts, is directly pertinent here:

> In *National Society of Professional Engineers v. United States,* 435 U.S. 679, 695 [98 S.Ct. 1355, 1367, 55 L.Ed.2d 637] (1978), we held that an anticompetitive restraint could not be defended on the basis of a private party's conclusion that competition posed a potential threat to public safety and the ethics of a particular profession. '[T]he Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable.' *Id.* at 696 [98 S.Ct. at 1367–1368]. *Professional Engineers* holds that the decision to replace competition with regulation is not within the competence of private entities. Instead, private entities may defend restraints only on the basis that the restraint is not unreasonable in its effect on competition or because its pro-competitive effects outweigh its anticompetitive effects.

Under established law, then, it would not matter if NAB's public interest arguments were correct.[75] The Congress has determined where the public interest lies when antitrust liability is in issue;[76] it lies in free and fair competition. The enactment of the Sherman Act represents a basic policy decision regarding the centrality of competition in American commercial life. If there are to be exceptions from that policy in favor of other, different public interest considerations, they must be made—as occasionally

---

**74.** Only where there is no anticompetitive effect and the parties have a legitimate purpose will agreements among competitors which restrain their commercial activities usually be upheld. *National Society of Professional Engineers v. United States, supra,* 435 U.S. at p. 696 n. 22, 98 S.Ct. at p. 1367 n. 22; *Neeld v. National Hockey League, supra; Smith v. Pro Football, Inc., supra,* 593 F.2d at pp. 1188–89 & n. 68.

**75.** As stated above, the Court need not, and does not, decide that question.

**76.** It is not necessary to consider here the extent to which other considerations may be relevant in other contexts (*e.g.*, relief by way of divestiture). See *United States v. Aluminum Co. of America,* 91 F.Supp. 333, 416 (S.D.N.Y. 1950).

they have been [77]—by the Congress; they cannot be read into the antitrust laws by the courts in the guise of construction or interpretation.[78]

## IX

■ Defendant finally relies on what it claims to be endorsements of its Code by various governmental bodies. These endorsements do not have weight defendant assigns to them.

First. None of the governmental actions cited is sufficient to confer upon the NAB and its Code an immunity from the antitrust laws. Such an immunity would have to be granted by the Congress, either directly in the form of an exemption from the antitrust laws,[79] or indirectly by legislation which vests explicit authority over the practice involved in an administrative agency or permits such an agency to exercise pervasive regulatory authority over the affected

industry.[80] Congress has not done so with respect to television advertising; no governmental entity other than the Congress has the authority to grant such immunity; [81] and defendant has acknowledged that it is not relying on the immunity principle.[82]

Second. Assuming, without deciding, that governmental sanction of conduct short of a grant of immunity may be an appropriate element for consideration in a Rule of Reason analysis,[83] it is clear that NAB's factual showing is, for the most part, insufficient to establish that governmental bodies endorsed the Code provisions at issue in this lawsuit.

Two congressional committees may have expressed their support for self-regulation in the broadcast industry some fifteen years ago; [84] but that support was couched in the most general terms and it did not focus in the slightest upon the advertising standards here at issue.[85] Self-regulation can obvi-

**77.** See notes 79–80 *infra*. Congress could, of course, have exempted television broadcasting, the NAB, or the NAB Code, from the antitrust laws and it may do so at any time hereafter.

**78.** An overwhelming portion of NAB's several briefs has been devoted to the public interest arguments, although, as indicated in the text, the Court is not free even to consider that defense. It is expected that at trial defendant will concentrate on the economic issues which are central to this case. Defendant's "public interest" evidence will be considered at that time only to the extent that it relates to the effect of the Code provision on competition (*e.g.*, p. 157 *supra*) or that it counters a claim of anticompetitive purpose.

**79.** Congress has done just that on a number of occasions (*e.g.*, 15 U.S.C. § 1012 (insurance); 49 U.S.C. § 1384 (air transportation); 15 U.S.C. § 62 (export trade associations)).

**80.** See, *e.g.*, *Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 373–78, 93 S.Ct. 1022, 1027–1030, 35 L.Ed.2d 359 (1973); *United States v. Radio Corp. of America*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 561, 64 S.Ct. 1162, 1178, 88 L.Ed. 1440 (1944). See also *United States v. American Telephone & Telegraph Co.*, 524 F.Supp. 1336 (D.D.C.1981); *United States v. American Telephone & Telegraph Co.*, 461 F.Supp. 1314, 1322–24 (D.D.C.1978).

**81.** See note 80, *supra*. Defendant therefore could not rely upon statements of various officials of the Department of Justice and of the Federal Communications Commission as support for some species of immunity from antitrust action.

**82.** Defendant's Supplemental Reply Brief at p. 24. Many of the arguments made in defendant's earlier briefs suggested that its Code activities had, in effect, been immunized.

**83.** But see *United States v. Socony-Vacuum Oil Co.*, *supra*, 310 U.S. at 225–27, 60 S.Ct. at 846; *Eugene Dietzgen Co. v. FTC*, 142 F.2d 321, 328–29 (7th Cir. 1944).

**84.** That support, by the House Committee on Interstate and Foreign Commerce, is found in H.R.Rep.No.1054, 88th Cong., 1st Sess. (1963). NAB also cites *Possible Anticompetitive Effects of Sale of Network Television Advertising: Hearings Before the Subcomm. on Antitrust and Monopoly of the Senate Committee on the Judiciary*, 89th Cong., 2d Sess. (1966) in support of its claim that the Senate Commerce Committee likewise endorsed the principle of self regulation. The Committee may well have done so, but no such endorsement is found in the cited hearings.

**85.** The House committee only said that "self-regulation by industry is an accepted and valuable supplemental regulatory tool, the effective use of which should be encouraged rather than discouraged." H.R.Rep.No.1054, *supra*, at p. 5.

ously have many purposes and can be carried out in many different ways. Endorsement of the general principle can therefore hardly be read to imply endorsement of discrete implementing documents such as the NAB Code, let alone of specific, contested provisions in advance of such contest.[86] Similar observations may appropriately be made concerning a Justice Department letter, also written in the 1960s,[87] and regarding most of the FCC words and actions relied upon by defendant.[88]

Third. NAB has not referred the Court to any governmental approval, either by the FCC or by any other department or agency, of the Code's program interruption standards. For the reasons stated above, NAB's governmental endorsement defense with respect to these standards must therefore be rejected.

Fourth. The time standards, by contrast, have been the subject of explicit comment by the Federal Communications Commission. The Commission favorably noted in a number of license renewal proceedings that the licensee had complied with these standards.[89] Moreover, in *Children's Television Report and Policy Statement*, 50 F.C.C.2d 1, 13 (1974), the Commission stated that the time standards, as they apply to children's programs, "are comparable to the standards which we would have considered adopting by rule in the absence of industry reform," and it went on to say that it would "expect all licensees ... to review their commercial practices in programs designed for children in light of the policies outlined by the Commission and the standards now agreed upon by substantial segments of the industry."

As indicated, these various FCC actions and comments all relate directly only to the Code's time standards. Inasmuch as the validity of these standards must await a trial decision in any event (see Part III *supra*) the Court need not now decide on the extent to which these comments may be regarded as a governmental sanction of the standards, and the effect, if any, of such a sanction on this antitrust suit. The parties may at trial present evidence regarding the question of FCC approval of the time standards, and they should be prepared at that time also to submit arguments on the legal effect of such approval.

## X

None of the charges brought by the government will be dismissed. The government's motion for summary judgment will be granted with respect to the multiple

---

**86.** There is no factual evidence to support the proposition that those who expressed approval of the self-regulation concept meant that approval to stand as a government sanction of the three sets of advertising standards at issue in this lawsuit.

**87.** The letter, from Assistant Attorney General Lee Loevinger (Exhibit B to Defendant's Motion to Dismiss), states that the Department was sympathetic to NAB's goal of establishing "standards of good taste and ethical conduct" and that these goals "would appear to be both commendable and in the public interest." NAB recognized at the time that the Justice Department letter provided little support for the Code, noting in its reply that "we were hopeful that your response could be much stronger." Letter from LeRoy Collins, Exhibit B to Plaintiff's Opposition to Motion to Dismiss.

**88.** See, *e.g.*, Public Service Responsibility of Broadcast Licensees [Blue Book], FCC Report (1946), p. 56; *Report and Order*, 36 F.C.C. 45, 50 (1964); *In re RKO General, Inc.*, 44 F.C.C.2d 123, 133 (1973); *In re Lamar Life Broadcasting Co.*, 3 F.C.C.2d 784, 786 n. 1 (1966). In a letter dated October 22, 1979 (while this litigation was pending) then Chairman Ferris of the FCC wrote to the Chairman of the House Subcommittee on Communications that the Commission "has been willing to accept the possibility of increased prices in order to achieve, through industry self-regulation, other public benefits." Chairman Ferris was also quick to point out, however, that the Commission "has never undertaken an antitrust review, as such, of the NAB Code"; that this is a Justice Department responsibility; and that the FCC has "never been asked to give antitrust-type blessing to the Code." Exhibit A to Supplemental Reply Memorandum of Defendant.

**89.** *E.g.*, *In re National Broadcasting Co.*, 20 F.C.C.2d 644, 645 (1969). However, the Commission has always looked to the individual licensees on a case-by-case basis for their own performance, not to that of an umbrella organization (see *Report and Order*, 36 F.C.C. 45, 49–50 (1964)) and licensee violations of the NAB Code are not penalized by the FCC.

product standard,[90] and an injunction is being issued this date ordering NAB to cancel and to cease enforcing that standard. The motions for summary judgment of both parties will be denied with respect to the time standards and the program interruption standards, and these matters will be set down for trial.

See also, D.C., 530 F.Supp. 607.

90. One additional NAB contention in opposition to the grant of summary judgment to the government may be dismissed summarily. In its final brief, NAB contends that the government's motion must be denied because NAB "has not been given sufficient opportunity to pursue pretrial discovery." Defendant's Supplemental Reply Brief at p. 30 n. 49. There is no basis whatever for this assertion. There appears to be no reason why NAB could not have engaged in discovery during the extended period while this action has been pending. In addition, it is likely that NAB would, more than anyone else, be in possession of information regarding the purpose and effect of its own Code standards.