In re WORKERS' COMPENSATION INSURANCE ANTITRUST LITIGATION.

AUSTIN PRODUCTS CO., A & M Moving & Storage Co., Tony Downs Foods Co., Butterfield Foods Co., The Diocese of Winona, Briggs Transportation Co., on behalf of themselves and all other similarly situated, Appellants,

v.

The WORKERS' COMPENSATION INSURERS' RATING ASSOCIATION OF MINNESOTA, The Travelers Insurance Company, Aetna Casualty & Surety Company, The Home Insurance Company, Fireman's Fund Insurance Company, St. Paul Fire & Marine Insurance Company, Employers Mutual Liability Insurance Company, Federated Mutual Insurance Company, Liberty Mutual Insurance Company, Sentry Insurance, a Mutual Company; Michigan Mutual Insurance Company, Twin City Fire Insurance Company, Excalibur Insurance Company, Continental Insurance Company, Transport Insurance Company, Employers Insurance of Wausau, A Mutual Co., Appellees.

No. 87–5378.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1988.

Decided Feb. 10, 1989.

K. Craig Wildfang, Minneapolis, Minn., for appellants.

James B. Loken, Minneapolis, Minn., for appellees.

Before LAY, Chief Judge, BROWN,* Senior Circuit Judge, and BEAM, Circuit Judge.

_____

* The HONORABLE JOHN R. BROWN, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, sitting by designation.

LAY, Chief Judge.

In April 1983, the plaintiffs,[1] who are Minnesota employers, filed a complaint in federal district court alleging that the defendants, who underwrite workers' compensation insurance in Minnesota, and the Workers' Compensation Insurers Rating Association of Minnesota (WCIRAM) had entered into a cooperative agreement not to charge less than the maximum lawful rate set by the Commissioner of Insurance. The plaintiffs alleged that the agreement was illegal under both the Sherman Act, 15 U.S.C. § 1, and the Minnesota Antitrust Law of 1971, Minn.Stat. §§ 325D.49 to 325D.66, specifically, Minn.Stat. §§ 325D.51 and 325D.53. The complaint alleged price fixing between 1979 and 1983 by the various compensation insurance carriers. The complaint asserted as well that the defendants agreed to boycott, coerce and intimidate other insurance companies and purchasers of workers' compensation insurance in order to enforce or maintain adherence to fixed prices and to prevent competition. The defendants filed a motion to dismiss for failure to state a claim upon which relief could be granted. Defendants asserted that their conduct was exempt from the application of the federal antitrust laws under the McCarran–Ferguson Act [hereinafter also referred to as Act]. In two separate opinions,[2] the district court held the McCarran–Ferguson Act exemption applicable in that the alleged practice constituted "the business of insurance," regulated by the state of Minnesota and that no evidence of boycott, coercion or intimidation existed. The district court therefore granted summary judgment for the defendants.[3] We reverse the grant of summary judgment on the boycott issue.

Following the passage by Congress in 1945 of the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015 (1982 and Supp.1986),[4]

---

1. This is a consolidated appeal of class actions commenced by Tony Downs Foods Co., A & M Moving and Storage Co. and Austin Products, Inc. in April 1983, by the Diocese of Winona and Butterfield Foods Co. in June 1983 and by Briggs Transportation Co. in July 1984. The actions have been consolidated but the classes are not yet certified.

2. Defendants originally moved to dismiss under Fed.R.Civ.P. 12(b). For the purposes of the motion the defendants conceded that they had "entered into a private agreement to fix the price of workers' compensation premiums." The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota, ruled that the conduct at issue was the business of insurance and was regulated by state law. Because plaintiffs had alleged "some level of enforcement activity," the motion to dismiss was initially denied. *In re Workers' Compensation Ins. Antitrust Litig.*, 574 F.Supp. 525, 535 (D.Minn.1983).

3. After completion of discovery, the Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, held there was not sufficient evidence of enforcement activity and that no proof of boycott existed under the 3(b) exception. He affirmed Judge Magnuson's earlier opinion that the conduct of the defendants was exempt from the federal antitrust laws under section 2(b) of the Act. *In re Workers' Compensation Ins. Antitrust Litig.*, No. 4-45-1166 (D.Minn. July 28, 1987) [hereinafter 1987 Order].

4. § 1011. Declaration of policy
   The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States. [McCarran–Ferguson Act, § 1]
   § 1012. Regulation by State law; Federal law relating specifically to insurance; applicability of certain Federal laws after June 30, 1948 [McCarran–Ferguson Act § 2]
   (a) State regulation. The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
   (b) Federal regulation. No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.
   § 1013. Suspension until June 30, 1948, of application of certain Federal laws; Sherman Act applicable to agreements to, or acts

the Minnesota legislature passed a comprehensive regulatory scheme for all types of insurance sold in Minnesota. The Legislature expressed its intended exemption from the federal antitrust laws by stating:

> The purpose of this act is to regulate trade practices in the business of insurance in accordance with the intent of [C]ongress as expressed in the [McCarran Act], by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

Act of Mar. 24, 1947, ch. 129 § 1, 1947 Minn.Laws, 188 (current codification at Minn.Stat. § 72A.17 (1988)). Prior to the passage of the McCarran–Ferguson Act, the Minnesota legislature had made it compulsory for all employers to carry workers' compensation insurance. Act of Mar. 12, 1937, ch. 64, § 1, 1937 Minn.Laws 109–10 (current codification at Minn.Stat. §§ 176.021–176.031 (1988)). Until 1984, the State Commissioner of Insurance was required to "adopt a schedule of workers' compensation insurance rates for use in [the] state * * *." Minn.Stat. § 79.071(1) (1982). Before 1979, no insurance rates could be set other than those established by WCIRAM and "approved as adequate and reasonable by the commissioner." Minn. Stat. § 79.21 (1978).

On June 7, 1979, the Legislature amended section 79.21 to allow insurers to "write insurance at rates that are lower than the rates approved by the commissioner provided the rates are not unfairly discriminatory." Minn.Stat. § 79.21 (1980). The revised statute mandated only that "[n]o insurer shall write insurance at a rate that exceeds" the Commissioner's approved rate schedule. *Id.*

The fundamental issues on appeal focus on the amendment of the Minnesota statute and whether the "deregulation" of price setting authorized by the statute was such to remove state regulation of price competition from protection by section 2(b) of the McCarran–Ferguson Act. An additional issue relates to the section 3(b) McCarran–Ferguson Act exception and whether there exists sufficient evidence of boycott, coercion or intimidation to overcome a summary judgment.

We hold, first, that the legislative amendment has not removed the state from regulation of private cooperative price fixing and that the defendants' exemption from the federal antitrust laws under section 2(b) of the Act still applies. Second, we hold that sufficient evidence exists as to proof of an agreement to boycott under the 3(b) exception of the Act. The district court accordingly erred in holding that the exception to McCarran–Ferguson Act immunity did not apply and in granting summary judgment. We therefore reverse and remand the case for further proceedings.

We deal with the issues separately.

**The Business of Insurance**

A conditional predicate to exemption from the federal antitrust laws under McCarran–Ferguson Act section 2(b) is that the state law must be enacted "for the purpose of regulating the *business of insurance* * * *." 15 U.S.C. § 1012(b) (1982 and Supp.1987) (emphasis added). Plaintiffs urge that the challenged practice engaged in by private insurers is not the business of insurance under the tests established by the Supreme Court in *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) and in *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 *reh'g denied*, 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979). These tests require first, that the practice result in the transfer or spread of a policy hold-

---

of, **boycott, coercion, or intimidation** [McCarran–Ferguson Act § 3]
(a) Until June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, and the Act of June 19, 1936, known as the Robinson–Patman Antidiscrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof.
(b) Nothing contained in this Act shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

er's risk; second, that the practice be an integral part of the policy relationship between the insurer and the insured; and third, that the practice be limited to entities within the insurance industry.

The district court rejected plaintiffs' argument, relying on the statement in *Royal Drug* that "[i]t is clear from the legislative history [of the McCarran–Ferguson Act] that fixing of rates is the "business of insurance."[5] Plaintiffs urge that this reference to the "fixing of rates" relates to only "cooperative rate making," which involves affirmative participation by the state. Plaintiffs urge further that a private agreement by the defendants does not involve transferring or spreading a policy holder's risk.[6] They argue that the horizontal agreement between insurers is entirely separate from their vertical contract with the policy holders. Further, they urge that these constituted factual issues in the application of the *Royal Drug* tests and that summary judgment was therefore improper. Defendants rely on many cases which have held that rate setting through a rating association is the business of insurance and is exempt under the McCarran–Ferguson Act. *See, e.g., Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 321–25 (D.C.Cir.), *cert. denied,* 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982) (horizontal price fixing among insurers through joint use of reimbursement formula for insurance claims is part of the business of insurance); *Owens v. Aetna Life & Casualty Co.*, 654 F.2d 218, 225–26 (3d Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct.

657, 70 L.Ed.2d 631 (1981) (joint rate setting and risk classification through rating association are the business of insurance); *Ohio AFL–CIO v. Insurance Rating Bd.*, 451 F.2d 1178 (6th Cir.1971) (fixing of automobile insurance premiums by rating organization and its members is part of the business of insurance), *cert. denied,* 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972); *Schwartz v. Commonwealth Land Title Ins. Co.*, 374 F.Supp. 564, 572–75 (E.D.Pa.1974) (conspiracy among insurance companies and their rating association to fix title insurance sellers' charge is part of the business of insurance); *California League of Indep. Ins. Producers v. Aetna Casualty & Sur. Co.*, 179 F.Supp. 65 (N.D. Cal.1959) (price fixing of commissions to be paid insurance agents is part of the business of insurance).[7] Aside from the support for the defendants' position found in *Royal Drug* and *National Securities*, we find that fixing of rates by the compensation carriers, whether by private or by state-approved rate setting, is integral to the price charged to policy holders and to the contractual relationship with the insured. Although a price fixing agreement may maximize profit, it is axiomatic that the fixing of rates is central to transferring and spreading the insurance risk. As has been noted, "[t]he classic market means of changing the size of customer pools would be through price changes." Sullivan & Wiley, *Recent Antitrust Developments: Defining the Scope of Exemptions, Expanding Coverage, and Refining the Rule of*

---

**5.** 440 U.S. at 224 n. 32, 99 S.Ct. at 1080 n. 32. *See also SEC v. National Sec.,* 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969) ("Certainly the fixing of rates is part of [the] business [of insurance]; that is what [*United States v.*] *South–Eastern Underwriters [Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944)], was all about.").

**6.** Justice Brennan made the same argument, dissenting in *Royal Drug,* 440 U.S. at 244, 99 S.Ct. at 1089.

**7.** Defendants emphasize that the plaintiffs initially concede that rate setting when authorized by the state is the business of insurance. Under such circumstances it makes little sense to say that cooperative rate setting, without state involvement, is not within the business of insur-

ance. It is the setting of the rates which constitutes the business of insurance. This characterization is not dependent upon the identity of the rate setters. Plaintiffs deny such a concession. They urge, however, that the cooperative exchange of information among insurers within the state-sanctioned rate making process is arguably the business of insurance since it relates to transferring and spreading the risk. Plaintiffs argue that the "charging" of uniform rates before 1979 was exempt from the Sherman Act under the "state action" doctrine (relying upon *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985)) and not under the McCarran–Ferguson Act. Although plausible, no authority supports this argument.

*Reason,* 27 UCLA L.Rev. 265, 283 (1979) [hereinafter Sullivan & Wiley]. The legislative history shows that private rate setting activity was the focus of the "business of insurance" at issue in *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). President Franklin D. Roosevelt stated: "Congress did not intend to permit private rate fixing, which the Antitrust Act forbids, but was willing to permit actual regulation of rates by affirmative action of the States." *Royal Drug,* 440 U.S. at 224, 99 S.Ct. at 1079 (Stewart, J.) (citing S. Rosenman, *The Public Papers and Addresses of Franklin D. Roosevelt, 1944–45* at 587 (1950)).

We are satisfied that the district court was correct in finding that the alleged private rate setting by the defendant companies fell within the McCarran–Ferguson Act 2(a) provision relating to the business of insurance.

We now turn to the issue of whether the alleged practice of private cooperative rate setting by defendant insurers is still regulated by the state in light of the 1979 Minnesota amendment.

**State Regulation**

■ The district court found sufficient state regulation of workers' compensation insurance rates to require exemption from the antitrust laws under McCarran–Ferguson Act section 2(b). Plaintiffs urge that the court erred in that the issue is not whether the regulation was *adequate* but whether

Minnesota's 1979 amendment has withdrawn regulation of rate fixing altogether.

The 1979 amendment to Minnesota Statute section 79.21 provided that insurers "may write insurance at rates that are lower than the rates approved by the commissioner provided the rates are not unfairly discriminatory." Defendants assert that the state still retained regulation of rate setting practices under section 79.071(1), which required the Commissioner to "adopt a schedule of workers' compensation insurance rates for use in [the] state" which "shall not be excessive, inadequate, or unfairly discriminatory." In addition, defendants urge that Minnesota Statute section 72A.25 [8] bestowed upon the Commissioner specific authority over "any person engaged in the business of insurance * * *" participating in any "method of competition [that] is unfair or * * * [any] act or practice [that] is unfair or deceptive * * *." Defendants urge that this comprehensive scheme provided the Commissioner with specific authority to regulate private cooperative rate setting activity.

In finding that the rate setting practices were exempt under section 2(b), the district court relied principally upon the reasoning of *FTC v. National Casualty Co.,* 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); this circuit's *Lawyers Title Co. of Mo. v. St. Paul Title Ins. Corp.,* 526 F.2d 795 (8th Cir.1975); *Dexter v. Equitable Life Assurance Soc'y of the United States,* 527 F.2d 233 (2d Cir.1975) [9] and *Ohio AFL–CIO v.*

8. Minn.Stat. § 72A.25 (1984) (in force throughout the relevant time period) reads in part:
**Unfair competition**
Subdivision 1. **Statement of charges; service; hearing.** Whenever the commissioner has reason to believe that any person engaged in the business of insurance is engaged in this state in any method of competition or in any act or practice in the conduct of that business which is not defined in section 72A.20, that said method of competition is unfair or that said act or practice is unfair or deceptive and that a proceeding by him in respect thereto would be to the interest of the public, he may issue and serve upon that person a statement of the charges in that respect and a notice of a hearing thereon to be held at a time and place fixed in the notice, which shall not be less than 20 days after the date of the service thereof. Each such hearing shall be conduct-

ed in the same manner as the hearings provided for in section 72A.22, and the provisions of that section as to service are made applicable to proceedings under this section. Upon good cause shown, the commissioner shall permit any person to intervene, appear and be heard at such hearing by counsel or in person. The commissioner shall, after the hearing, make a report in writing in which he shall state his findings as to the facts and shall serve a copy thereof upon the person upon whom he served his statement of charges.
Other subdivisions of the statute outline judicial enforcement measures to be initiated by joint action of the insurance commissioner and the state attorney general.

9. As Judge Feinberg observed:
State power to regulate necessarily includes the discretion to prohibit, permit, or limit

*Insurance Rating Bd.,* 451 F.2d 1178 (6th Cir.1971), *cert. denied,* 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972). The court concluded that section 72A.17 and chapter 79 in its entirety demonstrate that the legislature intended to occupy the field by defining and prohibiting activity it considered to be either an unfair method of competition or a deceptive practice. The district court concluded that the insurance commissioner had been given broad powers over the activities of individual companies and rating associations and therefore found that Minnesota regulated insurance for McCarran–Ferguson Act purposes.

We find plaintiffs' argument that the state has withdrawn regulation of rates goes too far. In 1979, the Minnesota legislature determined that uniform rate setting by the Commissioner would cease. It is true the State of Minnesota determined to promote price competition by leaving to the insurers' competitive judgment the setting of workers' compensation insurance rates below the allowable maximum. However, this policy change did not repeal the Commissioner's supervisory authority over rate setting practices. In section 72A.21, the Commissioner retained the "power to examine and investigate into the affairs of every person engaged in the business of insurance in this state in order to determine whether that person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by section 72A.19." [10]

One cannot reasonably argue that the use of illegal price fixing as alleged by plaintiffs' complaint is not an unfair method of competition. *See, e.g., United States v. Topco Assocs., Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) (horizontal restraints on trade are per se violations of the Sherman Act); *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 58 n. 28, 97 S.Ct. 2549, 2561 n. 28, 53 L.Ed.2d 568 (1977) (horizontal restrictions between retailers are per se violations). The phrase "unfair method of competition" deserves to be given a common meaning. In addition to the above considerations, the amendment to section 79.21 provides that the Commissioner shall set the maximum rate and that any rate used shall not be excessive or unfairly discriminatory. Thus, these provisions show that the Commissioner still retains the general power to regulate rates. Equally significant, we find nothing within section 79.21 which indicates that Minnesota has withdrawn the Commissioner's authority to supervise unfair methods of competition. Thus, we find that the Commissioner continues to regulate rate setting practices in the state.

The argument is made by commentators (and is inferentially relied upon by plaintiffs) that the state unfair methods of competition statute and the model unfair trade practices act are not regulatory laws intended to exempt the applicability of the federal antitrust laws.[11] *See* Sullivan &

---

insurance practices as the state sees fit. The McCarran–Ferguson Act clearly contemplates that where a state undertakes to regulate the business of insurance, it has the power to permit practices which would otherwise violate federal antitrust laws; if the exemption is only to apply when state law squarely prohibits all acts which would, absent the exemption, violate the antitrust laws, the state regulation which the McCarran–Ferguson Act aims to foster, 15 U.S.C. §§ 1011, 1012(a), would be a nullity.

*Dexter,* 527 F.2d at 236.

**10.** Minn.Stat. § 72A.19 (1984) states in part:

**Unfair methods and unfair or deceptive acts and practices prohibited**

Subdivision 1. No person shall engage in this state in any trade practice which is defined in sections 72A.17 to 72A.32 * * * to be an unfair method of competition or an unfair or

deceptive act or practice in the business of insurance.

Minn.Stat. § 72A.20 (1984) defines unfair or deceptive methods, acts or practices. Subdivision 4 specifically defines boycott, coercion and intimidation as unfair method or practices:

Entering into any agreement to commit, or by any concerted action committing, any act of boycott, coercion, or intimidation, resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance, shall constitute an unfair method of competition and an unfair and deceptive act or practice.

However, this specific prohibition does not limit unfair methods of competition solely to the use of boycotts. *Cf. Dexter,* 527 F.2d at 236.

**11.** A similar argument is extended to the nonapplicability of state antitrust laws: that is, they were not passed to regulate the business of

Wiley at 289–90; Weller, *To Preempt or to Accommodate: The Question of State and Federal Antitrust Laws Under the McCarran–Ferguson Act*, 9 U.Tol.L.Rev. 421, 424–25 (1978) [hereinafter Weller I]; Weller, *The McCarran–Ferguson Act's Antitrust Exemption for Insurance: Language, History and Policy*, 1978 Duke L.J. 587, 606–14 [hereinafter Weller II]. Commentators insist that *Dexter, Ohio AFL–CIO* and *Lawyers Title* are poorly analyzed in relying upon state unfair trade practice acts. It is urged that such laws do not serve to "impair, invalidate or supercede" state laws and that they are not regulatory in nature. Also, it is asserted that they should be read merely to accommodate federal antitrust laws and not to preempt. Plaintiffs make historical arguments that such laws were not intended to serve as regulation under the McCarran–Ferguson Act.[12] Furthermore, plaintiffs argue that incorporation of state unfair methods of competition statutes within the enforcement powers of the state insurance commissioner should not override the original purposes of the Act. The legislative history of the McCarran–Ferguson Act strongly suggests that this is not the type of state regulatory control originally contemplated.

Although some of these arguments contain logical appeal, we find them unpersuasive. In *FTC v. National Casualty*, 357 U.S. 560, 78 S.Ct. 1260, the Supreme Court applied general language from a state unfair practice act to preclude the FTC from exercising control over deceptive advertising practices. It has been urged that *FTC v. National Casualty* should be limited to its facts and that such an interpretation should be limited only to the applicability of the FTC Act and not the Sherman Act. *See* Sullivan & Wiley at 289 n. 116; Weller I at 445–49. We decline such an invitation. The fundamental issue is whether a general prohibition providing an insurance commissioner with authority under a state unfair method of competition or unfair practice act is regulation under the McCarran–Ferguson Act. In *FTC v. National Casualty* the Supreme Court held such a provision to be sufficient regulation of the business of insurance to exempt the application of the FTC Act.[13] It would be highly incongruous to reason that a general provision may be regulatory for the purposes of exempting the FTC Act and not the Sherman Act. Such an interpretation lies not within the authority of lower courts. As the state regulation does not appear in the form of state rate setting, as contemplated by the McCarran–Ferguson Act, the alleged price

insurance. They therefore simply serve to accommodate rather than to preempt the federal antitrust laws under the McCarran–Ferguson Act. *See* Weller, *To Preempt or to Accommodate: The Question of State and Federal Antitrust Laws Under the McCarran–Ferguson Act*, 9 U.Tol.L.Rev. at 431–38 (1978) [hereinafter Weller I]. *But cf. Royal Drug*, 440 U.S. at 247, 99 S.Ct. at 1091 (Brennan, J., dissenting) (citing *SEC v. National Sec.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969)) ("Statutes aimed at protecting or regulating [insurance company—policyholder] relationships, directly or indirectly, are laws regulating the 'business of insurance.' "); "[W]here a State enacts its own antitrust laws conferring § 2(b) immunity, § 3(b) retains Sherman Act coverage for those especially 'destructive ... practices.' " *Barry*, 438 U.S. at 566, 98 S.Ct. at 2942 (Stewart, J., dissenting) (citing *South–Eastern Underwriters*, 322 U.S. at 562, 64 S.Ct. at 1178).

12. For an excellent and complete legislative history of the McCarran Act, *see generally* Weller II.

13. Justice Stewart, dissenting in *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), explained:

*FTC v. National Casualty Co.*, * * * is the only case in this Court involving [to what extent a state must regulate the "business of insurance" to pre-empt the federal antitrust laws]. There, the Court held that the state statutes "prohibiting unfair and deceptive insurance practices," preempted Federal Trade Commission regulations "prohibiting respondent insurance companies from carrying on certain advertising practices found by the Commission to be false, misleading, and deceptive, in violation of the Federal Trade Commission Act...." Noting that no one had alleged that the state regulation was "mere pretense," the Court rejected the FTC's argument that the state regulation was "too 'inchoate' to be 'regulation' until [the state's statutory] prohibition has been crystallized into 'administrative elaboration of these standards and application in individual cases.' "
438 U.S. at 557 n. 4, 98 S.Ct. at 2938 n. 4 (Stewart, J., dissenting) (citations omitted).

fixing agreement would appear to violate federal law. However, the reason the defendants are not subject to per se liability for price fixing under the federal antitrust laws is because the state has retained "inchoate" regulation over unfair methods of competition. *FTC v. National Casualty,* 357 U.S. at 564–65, 78 S.Ct. at 1262.

Thus, we find that the State of Minnesota provides the Insurance Commissioner with regulatory authority over unfair methods of competition. The amendment to section 79.21 allowing private rate setting does not divest the Commissioner of this regulatory power. Under such circumstances we find that the application of the federal antitrust laws is suspended under section 2(b) of the McCarran–Ferguson Act. The federal antitrust laws therefore do not apply to the alleged rate fixing practices of the defendant workers' compensation insurance carriers.

**The Agreement to Boycott**

Section 3(b) of the McCarran–Ferguson Act provides an exception to immunity from the antitrust law when the state has regulated the business of insurance. If there exists any agreement to or act of "boycott, coercion or intimidation," the exemption is lost. As stated in *Barry:*

> The [McCarran–Ferguson Act] debates make clear that the "boycott" exception was viewed by the Act's proponents as an important safeguard against the danger that insurance companies might take advantage of purely permissive state legislation to establish monopolies and enter into restrictive agreements falling outside the realm of state-supervised cooperative action.

438 U.S. at 547, 98 S.Ct. at 2932.

Plaintiffs urge that at the very least their evidence demonstrates that defendants have entered into restrictive agreements to boycott and have engaged in acts of coercion and intimidation in enforcing an illegal price fixing agreement. After discovery, the district court awarded summary judgment to the defendant companies, holding as a matter of law that no evidence of a boycott agreement or act exists.

The issue we face on appeal is whether plaintiffs' proof is sufficient to overcome a motion for summary judgment. We need not dwell on oft-repeated standards governing summary judgments other than to observe that the non-moving party is always entitled to the benefit of all favorable inferences and that all genuine issues of fact must be resolved by a jury. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The plaintiffs may not rely upon mere allegations or denials in their pleadings, but the overall record must be evaluated in determining whether summary judgment should be granted. *See Robinson v. Monaghan,* 864 F.2d 622 (8th Cir. 1989).

Our review of the overall record convinces us that the district court erred in granting summary judgment under the McCarran–Ferguson Act section 3(b) exception to antitrust immunity. In providing plaintiffs all favorable inferences, we find sufficient evidence to create genuine issues of fact as to whether the defendants entered into an agreement or acted to boycott, coerce or intimidate workers' compensation insurers to agree to enforce a uniform rate for workers' compensation insurance from 1979 to 1983 in Minnesota. In holding that there was insufficient evidence that defendants entered into an agreement to or committed an act of boycott, the district court found the following: (1) that evidence of ordinary price fixing, without enforcement activity, does not constitute a boycott (*see St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 545 n. 18, 98 S.Ct. 2923, 2932 n. 18, 57 L.Ed.2d 932 (1978)) and (2) that plaintiffs' evidence of enforcement activity —(a) WCIRAM bylaws, (b) WCIRAM subscription forms, (c) WCIRAM circular letters, (d) WCIRAM insurance policy reviews and (e) WCIRAM policy prohibiting division of payroll—is insufficient to provide the necessary inference of an agreement to or act of boycott.

With all due respect, our reading of the record causes us to disagree with the dis-

trict court. We find sufficient evidence, if unrebutted or if believed, that would clearly justify a jury finding that during the relevant time period an illegal boycott agreement existed between WCIRAM and its members in violation of the federal antitrust laws.

■ We begin our discussion with the basic understanding of the term "boycott." The Supreme Court has recently defined boycott as "a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *Barry*, 438 U.S. at 541, 98 S.Ct. at 2930 (footnote omitted). The Court indicated that for McCarran–Ferguson Act purposes, the terms boycott, coercion and intimidation

should be given meanings consistent with their traditional Sherman Act usage. *Id.*[14]

■ It is also clear that under the 3(b) exception, exposure of the companies to antitrust liability (notwithstanding state regulation) does not swallow the section 2(b) exemption. Thus, under the McCarran–Ferguson Act, the boycott definition is not coextensive with the prohibitions of the Sherman Act. *Barry*, 438 U.S. at 545 n. 18, 98 S.Ct. at 2932 n. 18. Thus, we agree with the district court that the practice of mere price fixing, i.e., a refusal to deal except at a specified price, without more, is not within the confines of the term boycott under the McCarran–Ferguson Act.[15]

The district court's basic conclusion rests on the fact that defendants' acts did not go beyond mere price fixing and that "there is

**14.** The term boycott has a long tradition of usage. As stated in an early case: "Courts differ as to what constitutes a boycott that may be enjoined. All hold that there must be a conspiracy causing irreparable damage to the business or property of the complainant." *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 437, 31 S.Ct. 492, 496, 55 L.Ed. 797 (1911). The First Circuit has said: "The classic anticompetitive 'group boycott' is a concerted action by competitors at one level to protect themselves from competition by non-group members who seek to compete at that level." *Allied Int'l, Inc. v. International Longshoremen's Ass'n*, 640 F.2d 1368, 1380 (1st Cir.1981), *aff'd*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982) (citation omitted). The Third Circuit has provided another description: " '[C]lassic' boycotts [include those] in which a group of business competitors seek[s] to benefit economically by excluding other competitors from the market place. 'The crucial element' in such boycotts, according to Professor Sullivan, 'is an effort to exclude or cause disadvantage to one or more competitors by cutting them off from trade relationships which are necessary to any firm trying to compete.' " *Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr. Trades Council*, 670 F.2d 421, 429–30 (3d Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982).

The Supreme Court has held that the means used to restrain competition were irrelevant. *See Gompers*, 221 U.S. at 438, 31 S.Ct. at 496. *See also American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946). What is important is that an anticompetitive motive propel the actions. " 'In each of [the] cases [finding an illegal boycott] the aim and purpose of the group boycott or refusal to deal was either to compel the object of the boycott to adopt a certain standard of

trade practice, or to exclude him from competition.' " *M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 979 (1st Cir.1984) (citation omitted). *See also American Tobacco*, 328 U.S. at 809, 66 S.Ct. at 1138 ("It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns.").

Similarly, it matters not whether the actions *currently* restrain competition, if they pose the threat of future trade restraint: "It is the 'contract, combination ... or conspiracy in restraint of trade or commerce' which § 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other." *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 225 n. 59, 60 S.Ct. 811, 846 n. 59, 84 L.Ed. 1129 (1940). *Accord Associated Press v. United States*, 326 U.S. 1, 12, 65 S.Ct. 1416, 1420, 89 L.Ed. 2013 (1945). The rationale for this is that "we [cannot] be certain that the challenged practice, though not destructive of existing competition, did not abort yet unborn competitors equally within the concern of the Sherman Act." *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 622, 73 S.Ct. 872, 887, 97 L.Ed. 1277 (1953). *See also United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *American Tobacco*, 328 U.S. at 814, 66 S.Ct. at 1141.

**15.** Plaintiffs rely upon the meaning of the additional words coercion and intimidation set forth in § 3(b). We see no reason why those words should not enjoy their ordinary meanings. Whether they may include activity short of proof of an agreement to boycott is not necessary for us to decide. We find ample evidence of a boycott and such evidence clearly supports agreements and acts to coerce and intimidate under the Act.

no evidence of any enforcement acts beyond a reluctance to sell except at a specified price." 1987 Order at 22.

The district court added that "[e]ven if the Court were to construe the articles and bylaws as potential means to enforce an alleged price fixing agreement,[16] there is nothing to suggest those means were successful." 1987 Order at 15. The court continued: "Defendants have made no use of any enforcement means purportedly at their disposal; without doing so, no restraint on trade can occur." *Id.*[17]

■ We find such reasoning overlooks the section 3(b) exception that an agreement to boycott is as much illegal as is an act of boycott.[18] As the Supreme Court stated in a different context, although applicable here:

No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy

in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words. *United States v. Schrader's Son, [Inc.]*, 252 U.S. 85, [99–100, 40 S.Ct. 251, 253, 64 L.Ed. 471 (1920)]. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful agreement, the conclusion that a conspiracy is established is justified. Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.

*American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

■ Plaintiffs' evidence supports a finding of private cooperative price fixing (admitted by defendants for purposes of summary judgment). Additionally, we find sufficient evidence that a jury could reasonably find that an express agreement existed to exclude insurers from WCIRAM membership if the prescribed rates were not utilized, as well as acts of intimidation and coercion to maintain uniform rates by

**16.** One type of conduct which has been found subject to Sherman Act scrutiny is the enforcement of an association's rules. *See National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 686, 98 S.Ct. 1355, 1362, 55 L.Ed.2d 637 (1978); *Associated Press*, 326 U.S. at 12, 65 S.Ct. at 1420; *Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr. Trades Council*, 670 F.2d 421, 432 (3d Cir.1982), *citing Consolidated Express, Inc. v. New York Shipping Ass'n*, 602 F.2d 494, 522–23 (3d Cir.1979), *vacated and remanded on other grounds*, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980); *United States Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 788 (7th Cir.1981). *Cf. Moore v. Boating Indus. Ass'ns*, 754 F.2d 698, 706 (7th Cir. 1985).

**17.** The court's reasoning became apparent in its question during oral argument: "The issue I am concerned with here is where is the blood? Who was coerced? Who suffered at the hands of a concerted conspiratorial activity? What insurance policies were forced to be rated and priced at a higher rate? Show me the body." Brief for Appellee at 38, *In re Workers' Compen-*

*sation Litig.* (8th Cir.) (No. 87–5378) [hereinafter Brief for Appellee].

**18.** As Judge Greene stated in *United States v. National Ass'n of Broadcasters*, 536 F.Supp. 149 (D.D.C.1982):

[I]t is well established that the parties to an agreement which *per se* violates the antitrust laws may not defend on the basis that they have applied no coercion to bring about adherence to the combination or to compel obedience to its terms.

\*   \*   \*   \*   \*   \*

It is, indeed, difficult to see why legal unenforceability or lack of formal sanctions should be considered a valid defense. Combinations of entities which fix prices, manipulate supplies, or engage in other anticompetitive conduct are almost always "voluntary" in the sense that a recalcitrant co-conspirator cannot be required, in a court of law, to keep his bargain. But that lack of legally-enforceable coercion—needless to say—does not establish a defense under the antitrust laws. *Id.* at 163–64.

all workers' compensation carriers. All carriers knew that expulsion from WCIRAM carried with it the threat, if not the express statutory requirement, that a carrier could no longer underwrite workers' compensation insurance in Minnesota.

We turn now to our discussion of the evidence. Although we compartmentalize our discussion, as did the district court, we emphasize that a piece-meal analysis must be avoided and the overall conduct of the defendants must be weighed in determining whether there exists sufficient proof of motive and intent to overcome a summary judgment. *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962); *Alexander v. National Farmers Org.,* 687 F.2d 1173, 1193, 1207–08 (8th Cir.1982), *cert. denied,* 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983).[19]

WCIRAM was organized as a rate setting and classification bureau by the Minnesota legislature in 1921. *See* Act of Mar. 15, 1921, ch. 85 § 11, 1921 Minn.Laws 134. Since that time, WCIRAM membership has been required for a carrier to participate in the business of underwriting workers' compensation insurance in Minnesota. Until 1979, the Insurance Commissioner generally set the rates for all workers' compensation carriers. In 1979, the Minnesota legislature amended the workers' compensation statutes to allow rates to be set by individual insurers below the Commissioner's set maximum. Act of May 30, 1979, ch. 271 § 2, 1979 Minn.Laws 592; Act of June 7, 1979, ch. 3 § 11, Extra Sess. 1979 Minn.Laws 1261 (codified at Minnesota Statute section 79.21 (1980). WCIRAM's bylaws were not immediately changed in response to the amendments. WCIRAM's bylaws applicable from June 8, 1979, to January 26, 1982, allowed the association to set rates for all carriers[20] and required adherence to such rates by all carriers as a condition of WCIRAM membership.[21] In 1982, the bylaws were amended to permit member insurers to depart from the association's filings "in accordance with the requirements of law * * *."[22]

The district court held that between 1979 and 1982, absent evidence of expulsion, there was no intent to boycott members from WCIRAM because the old bylaws were simply "vestiges" of the past when uniform rate setting was done jointly by

19. Particularly appropriate is the Supreme Court's following statement:
[S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long as been the hallmark of "even handed justice."
*Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (footnote omitted).

20. The articles provided in relevant part:
Article VI—Powers of the Rates and Classification Committee
The Rates and Classification Committee shall have the authority in [sic] behalf of the Association to classify and rate all workers' compensation risks in the state of Minnesota. It shall adopt appropriate rules and regulations and a manual of rules, classifications and rates for the underwriting of such risks and systems for the merit rating.
\* \* \* \* \* \*
Article XI—Services of Association

4. "The Association classifications and rates shall be binding upon all insurers...."
Joint Appendix at 264–65, *In re Workers' Compensation Litig.,* (8th Cir.) (No. 87–5378) [Hereinafter Joint Appendix].

21. Those same bylaws also provided:
Article IX—President
4. The President shall enforce these Articles and Bylaws and all rules and regulations of the Association.
\* \* \* \* \* \*
Article XV—Withdrawals
2. No member shall be entitled to any refund of any portion of its minimum assessment by reason of its withdrawal or expulsion from the Association.
Joint Appendix at 264–65.

22. The January 26, 1982 amendments to the WCIRAM Articles of Association and Bylaws included an amendment to Article III section 2(c): "Each member shall [a]dhere to all filings made by the Association on its behalf except to the extent that such member shall obtain the right to use departures from such filings in accordance with the requirements of law specifically applicable thereto[.]" Joint Appendix at 265–66.

WCIRAM and the Commissioner. The court also found that nothing in the 1982 articles and bylaws made the rates binding on all insurers because "departures" from filings were permitted. The court reasoned that the filing-departure provision was in conformity with the 1979 amendment allowing competitive pricing.

The district court's conclusion overlooks several factors which a trier of fact could weigh in determining the existence of an agreement to boycott, coerce or intimidate. The available inferences, which must favor the plaintiffs' position, support a holding contrary to that of the district court. First, it is alleged (and verified by affidavit)[23] that after 1979, WCIRAM continued to fix a uniform rate to be charged by all members. Second, plaintiffs assert that statements by officers of WCIRAM member insurers provided admissions that a uniform rate was still necessary in carrying on a viable workers' compensation insurance business in Minnesota and that the competitive rate policy set by the Legislature (deviation from fixed rates) was detrimental to the defendant-insurers' interests. Third, efforts to enforce uniform rate adherence continued notwithstanding the pro-competitive amendment of section 79.21. Under such circumstances, it is a fair factual inference that WCIRAM insurers utilized the threat of bylaw-sanctioned expulsion from WCIRAM to achieve adherence to uniform price fixing notwithstanding an explicit state declaration favoring competitive pricing.

The 1982 bylaws support this conclusion and do not detract from it. The language of Article XII of the 1982 bylaws is identical to provisions contained in the 1979 and 1981 bylaws. Article XII subsection (4) of the 1982 bylaws provides: "The Association classifications and rates shall be binding upon all insurers." Joint Appendix at 267. Further intent to continue uniform rate enforcement is found in the synopsis of the proposed 1982 articles sent by WCIRAM to its members which stated that the new Article XII "[r]eplaces former Article XI[24] without change." Joint Appendix at 453. The 1981 version of the articles also contains the following:

#### Article II   Object

The Association shall be maintained for the following purposes:

1. To make classifications, rules, rates, rating plans, policy forms and endorsements.

\*       \*       \*       \*       \*       \*

#### Article VI   Rates Committee

3. The Rates Committee shall have full operational responsibility for all matters relating to pricing activities, forms, manuals and methods for collecting and reporting statistical data.

Joint Appendix at 455, 458–59.

A subscription agreement was attached to the copy of the bylaws sent to each WCIRAM member insurer. Each company was to execute the subscription form, which read in part that each subscribing insurer agreed "to observe and to be bound by the * * * rates * * * of the Workers' Compensation Insurers Rating Association of Minnesota." Joint Appendix at 271 (reproduced copy of WCIRAM subscription form). The plaintiffs assert that WCIRAM's rates were the same as the maximum rates permitted by the Commissioner.[25]

---

**23.** *See* Brief for Appellant at 10, *In re Workers' Compensation Litig.,* (8th Cir.) (No. 87–5378) [hereinafter Brief for Appellant].

**24.** *See supra* n. 20 for relevant portions of former Article XI.

**25.** Brief for Appellant at 12. WCIRAM President Hildebrandt's deposition recited:

Q. Mr. Hildebrandt, why did the Rating Association require a signature on the subscription form from any insurer?

A. We felt that that made the—excuse me, bound the carrier as the subscription form states, to be responsible for paying assessments, doing the other things that the Articles of Association say they must do in order to maintain membership.

Q. Including observing and being bound by the rules, rates and regulations of the Rating Association?

A. Yes.

Q. Mr. Hildebrandt, would you agree with the statement that this subscription form, re-

The synopsis of the 1982 revised articles also provides: "This Article [III] also includes provision for expulsion of members not fulfilling their obligations." Joint Appendix at 452. This provides convincing evidence that under WCIRAM's own interpretation of the bylaws, expulsion was available to sanction members refusing to adhere to maximum rates.

The district court emphasized that under Article III 2(c) of the 1982 bylaws each WCIRAM member had the "right to use departures from such filings in accordance with the regulations of law specifically applicable thereto[.]" The court found that this indicates that WCIRAM's classification and rates were thus not binding on all insurers and were compatible with the amendments to Minnesota Statute section 79.21 allowing price competition. Although we generally give deference to its interpretation, we hold that the district court has misinterpreted Article III 2(c).[26]

Article III 2(c) must be read in the context of all coexisting articles. Fundamental rules of construction counsel that each clause should be interpreted to be given effect. If possible, all clauses should be construed as consistent with other clauses.[27] Article XII was moved from Article XI without change and reads in relevant part: "The Association classifications and rates shall be binding upon all insurers." Joint Appendix at 267.

The plaintiffs' evidence shows that the Insurance Commissioner stated that compensation insurance carriers were not required to file rates with the Insurance Division after June 7, 1979.[28] We find that Article III 2(c) relates to required filing of policy forms, statistical plans, and so forth. It cannot reasonably be intended to refer to deviations from rate filings since such filings were no longer required.

The 1979 articles referred to the President's enforcement obligations. Article IX (4) stated: "The President shall enforce these Articles and Bylaws and all rules and regulations of the Association." Joint Appendix at 264–65. Those rules included adherence to WCIRAM's set rate schedule. *See supra* note 20. This version of the articles mentioned expulsion of members only in passing.[29]

The January 26, 1982 bylaws amendments for the first time provided that any WCIRAM board decision to expel must be referred to the Minnesota Insurance Commissioner.[30]

quiring the signature on the subscription form is a method of enforcing the Articles and Bylaws of the Rating Association?
A. I think it's that and something else, yes. *Id.* at 13.

**26.** The text of Article III 2(c) appears *supra* n. 22.

**27.** The bylaws are subject to judicial interpretation just as is any other contract. Each bylaw must be construed within the four corners of the agreement. "It is fundamental to contract interpretation that we must construe the contract as a whole and attempt to give meaning to all parts, consistently with one another." *Corso v. Creighton Univ.,* 731 F.2d 529, 532 (8th Cir. 1984). *Accord United States v. Brown,* 801 F.2d 352, 354 (8th Cir.1986). If the contract language is ambiguous "its meaning becomes a question of fact for the jury." *Thomas v. Bakery, Confectionery & Tobacco Workers Union Local #433,* 826 F.2d 755, 764 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1019, 98 L.Ed.2d 984 (1988). Further, the meaning of ambiguous terms should be construed against the drafter. *Chauffeurs, Teamsters & Helpers, Local Union 238 v. C.R.S.T., Inc.,* 780 F.2d 379, 382, 384 (8th Cir.1985), *rev'd on other grounds*

*on reh'g,* 795 F.2d 1400 (8th Cir.) (en banc), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

**28.** Brief for Appellant at 48.

**29.** Article XV, (2) concerning withdrawals, read: "No member shall be entitled to any refund of any portion of its minimum assessment by reason of its withdrawal or expulsion from the Association." Joint Appendix at 265.

**30.** Article III—Membership
\* \* \* \* \* \*
4. A member may continue as such only so long as the obligations attendant upon membership status are fulfilled. A resolution to the effect that such obligations are not being fulfilled by a designated member may be presented to the Board of Directors at any meeting thereof by the President or by any member but a vote on such resolution shall not be taken until the member has received a copy of the resolution and been given an opportunity for a hearing before the Board of Directors and shall not be adopted unless there are at least five affirmative votes nor unless notice that such resolution is to be

The district court held that WCIRAM lacked the power to expel any member for non-adherence to the bylaws. We must respectfully disagree.

To construe Article III(4) to mean that the Association lacked the power to expel would require a holding that only the Commissioner had the power to expel a member from WCIRAM. The articles do not provide the Commissioner with such a power. The Commissioner is not a party to the WCIRAM agreement. Nothing in either the statute or the bylaws provides the Commissioner with exclusive expulsion authority.

However, even if the defendants' interpretation is correct, a fact finder could reasonably construe other evidence of threats and intimidation by WCIRAM that it possessed the power to expel from its membership those companies who refused to adhere to the fixed rates set by WCIRAM. The fact that insurance companies may have had a legal right to deviate from the set rates does not diminish the threat of expulsion by WCIRAM if a company refused to comply with the fixed rate. Certainly, the conduct of WCIRAM would not provide an insurer any assurance that expulsion was unavailable as a possible sanction for non-compliance with the bylaws. In this regard, President John Hildebrandt, representing WCIRAM, sent a letter to non-subscribers on April 13, 1983. He stated in part: "This letter will serve as notice that your company's membership will be terminated as of May 15, 1983 in absence of the signed Articles." Joint Appendix at 445. WCIRAM sent circular letters to all members directing the utilization of WCIRAM's rates.[31]

In sum, the bylaws speak for themselves: if a member fails to fulfill any of its obligations, including adherence to fixed rates by WCIRAM (as required by Articles III(4), VI and XII(4)), its membership is to be terminated. Notification of the Commissioner of the resolution to expel is prescribed by the bylaws. There is nothing within either the bylaws or the statutes which provides any other procedure for expulsion. Under the statutes it would seem clear that if an insurance company is not a WCIRAM member, the company can no longer continue to underwrite workers' compensation insurance in Minnesota. *See* Minn.Stat. § 79.11.

We find a plethora of other evidence which supports an inference of an agreement to boycott, coerce or intimidate companies into adherence to a fixed price.

There is evidence that WCIRAM reviewed each policy to see that a company applied the "correct rate." If a rate deviated from the uniform rate, a "policy correction" notice would be issued disapproving such rate. As plaintiffs point out, as late as November 12, 1981, minutes of a WCIRAM task force meeting recited: "Association staff noted that the emergence of both classification and rate deviation may change the future focus of their 'policing' activities. Presently a good deal of effort is expended in reviewing policies at issuance for conformance with classes, rates, and rating factors which are all standardized thru [sic] the Basic Manuals." Joint Appendix at 434.

In 1979, the legislature passed section 79.211 subdivision 2 which provided: "**Division of payroll.** An insurer shall permit an employer to divide his payroll among the rating classifications most closely fitting the work actually performed for purposes of premium calculation when the employer's records provide adequate support for a division." Thus, price competition under section 79.211(2) necessarily required

---

considered by the Board of Directors has been given to the members of the said Board and to the designated member at least twenty (20) days prior to the meeting at which the vote on such resolution is to be taken. *Such resolution, if adopted, shall be referred to the Commissioner of Insurance for attention.*
Joint Appendix at 265–66 (emphasis added).

31. These rates were consistently set at the maximum allowable. Reply Brief for Appellant at 25 n. 17, *In re Workers' Compensation Litig.*, (8th Cir.) (No. 83–5378). Insurers represented to their policyholders that they were bound to abide by the rates of the "regulatory authority * * * by law." Joint Appendix at 315 (Letter from CNA Insurance Company to Union Scrap Iron and Metal Company (Mar. 24, 1983)).

that an employer be permitted to divide its payroll among employee classifications reflecting different specific (and frequently lower) rates. Despite this legislative mandate, employer and insurer payroll division requests to WCIRAM were denied. The evidence shows that WCIRAM resisted these efforts.[32]

Last, we disagree with defendants' claim that without evidence of enforcement (namely, expulsion) no restraint of trade can be shown. As indicated, section 3(b) speaks not only of acts of boycott but also of agreements to boycott. It is well settled that a Sherman Act section 1 violation may occur by mere participation in an agreement to boycott without any act of coercive enforcement occurring. *Wilk v. American Medical Ass'n,* 719 F.2d 207 (7th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984); *see also United States v. National Ass'n of Real Estate Bds.,* 339 U.S. 485, 489, 70 S.Ct. 711, 714, 94 L.Ed. 1007 (1950), *American Tobacco Co. v. United States,* 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1946); *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 845 n. 59, 84 L.Ed. 1129 (1940); *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 614, 34 S.Ct. 951, 955, 58 L.Ed. 1490 (1914); *Southway Theatres, Inc. v. Georgia Theatre Co.,* 672 F.2d 485, 492 (5th Cir. Unit B 1982); *Tire Sales Corp. v. Cities Serv. Oil Co.,* 637 F.2d 467, 474 (7th Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981).

## Conclusion

Under the 2(b) provision of the McCarran–Ferguson Act, it is one thing to enjoy antitrust immunity for fixing prices under a permissive or unenforced state regulatory system. However, it is clearly another concern for a group to enter into an agreement to force a competitor out of business if he fails to adhere to an illegal agreement. The boycott provision under section 3(b) of the McCarran–Ferguson Act permits the former agreement, but not the latter. Our result here is consistent with the overall policy of the antitrust laws: to promote competition. Justice Brandeis, discussing a labor agreement to boycott, once observed: "The right to carry on business—be it called liberty or property—has value. To interfere with this right without just cause is unlawful." *Dorchy v. Kansas,* 272 U.S. 306, 311, 47 S.Ct. 86, 87, 71 L.Ed. 248 (1926). His concern is applicable here.

We conclude that the district court erred in granting summary judgment for the defendant workers' compensation insurance carriers and WCIRAM. We find more than sufficient evidence and the available inferences therefrom to create a question of fact concerning the defendants' motive and intent to boycott, coerce or intimidate insurers in adhering to a fixed rate under threat of expulsion from membership in WCIRAM.[33] There is overwhelming evidence that such a boycott was agreed upon to thwart the competitive pricing policy approved by the Minnesota legislature in 1979. Accordingly, we vacate that portion of the district court's judgment which finds that no evidence exists of an agreement by the defendants to boycott, coerce or intimidate other insurers under McCarran–Ferguson Act section 3.

Since federal jurisdiction is predicated upon the Sherman Act, the district court should in the interest of judicial economy also accept pendent jurisdiction of the plaintiffs' state law claims. We also reverse and vacate that portion of the judgment which denied pendent state court claims for further consideration by the trial court.

We therefore affirm the district court's judgment that defendants have shown sufficient state regulation of the business of insurance to invoke immunity from liability for Sherman Act violations under McCar-

---

**32.** Plaintiffs assert that in 1981 WCIRAM was removed from involvement in division of the payroll by amendment to 79.211(2). *See* Brief for Appellant at 20. There is evidence that WCIRAM adopted other means to circumvent the law and to resist payroll division. *Id.* at 20 & n. 23.

**33.** *See supra* n. 19.

ran–Ferguson Act section 2(b). However, we vacate that portion of the defendants' dismissal under section 3(b) of the McCarran–Ferguson Act. We hold that plaintiffs have produced sufficient evidence of an agreement to boycott, coerce or intimidate to trigger an exception to section 2(b) immunity. We also reverse the dismissal of plaintiffs' pendent state court claim.

IT IS SO ORDERED.

BEAM, Circuit Judge, concurring.

I concur with the result reached by the majority, finding that the district court erred in granting summary judgment in favor of defendants in reliance upon the McCarran–Ferguson Act, but do so for reasons different from those expressed in the majority opinion. In my view, the alleged acts of price fixing mentioned in the complaint were not "regulated by state law" as envisioned by McCarran–Ferguson. The Act does not, therefore, bar plaintiffs' statutory claims.

The McCarran–Ferguson Act is designed primarily to preserve state regulation and taxation of the business of insurance. 15 U.S.C. § 1011. The Act exempts the business of insurance from the operation of any federal law which operates to "invalidate, impair, or supersede" state insurance regulation. 15 U.S.C. § 1012(b). However, the Act also provides that the Sherman Act and the Clayton Act "shall be applicable to the business of insurance to the extent such business is not regulated by State law." Id. Further, regardless of the existence of state regulation, the Sherman Act applies to any agreement between insurers to "boycott, coerce, or intimidate, or [any] act of boycott, coercion, or intimidation." 15 U.S.C. § 1013(b). This statutory framework establishes three requirements which must all be met to obtain the exemption from anti-trust liability. Conduct which is 1) part of the business of insurance; 2) regulated by state law; and 3) not in the form of coercion, intimidation, or boycott, is removed from antitrust scrutiny under the Act. *Health Care Equalization Committee v. Iowa Medical Soc'y*, 851 F.2d 1020, 1028 (8th Cir.1988). *See Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 124, 102 S.Ct. 3002, 3006, 73 L.Ed.2d 647 (1982). My concern in this case is with the application of the second requirement.[1]

Defendants allege that the State of Minnesota enacted a generally comprehensive regulatory scheme which encompassed the setting of workers' compensation insurance rates, and that such a general regulatory scheme is sufficient to meet the requirement of state regulation under McCarran–Ferguson. The district court agreed, and found that the challenged conduct was regulated as required by McCarran–Ferguson. In so holding, the court relied on two decisions it deemed controlling, *Federal Trade Comm'n v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958), and *Lawyers Title Co. v. St. Paul Title Ins. Co.*, 526 F.2d 795 (8th Cir.1975). I believe these cases support the conclusion that the facts here do not satisfy the state regulation requirement.

In *National Casualty*, the plaintiffs sought to set aside certain cease-and-desist orders issued by the Federal Trade Commission which prohibited alleged false and misleading advertising practices. Plaintiffs alleged that McCarran–Ferguson prohibited such interference because unfair and deceptive advertising practices were a part of the business of insurance which was regulated by state law. The Supreme Court agreed, deciding that the states in question had "regulated" the practices at issue. The Court said that each state had enacted "prohibitory legislation which proscribes unfair insurance advertising and authorizes enforcement through a scheme of administrative supervision." *Id.* at 564, 78 S.Ct. at 1262. While the Court did speak in terms of a generally comprehensive regulatory scheme, the regulations involved in the case dealt specifically and in detail with the practices at issue in the

---

**1.** In applying this statute to the case at hand, it should be remembered that exemptions from the antitrust laws are to be narrowly construed, and that the burden of establishing the applicability of such an exemption is upon the party asserting it. *See Pireno*, 458 U.S. at 126, 102 S.Ct. at 3007; *Seasongood v. K & K Ins. Agency*, 548 F.2d 729, 732 (8th Cir.1977).

lawsuit. There was more than simply a regulatory presence in the industry—there were specific directives which prohibited the challenged conduct. *National Casualty* does not, as the district court and the majority suggest, infer that regulation which only inferentially affects a challenged practice is sufficient to satisfy the McCarran–Ferguson requirement.

In *Lawyers Title*, plaintiffs set forth allegations of predatory pricing activities against the defendant title insurance company. At issue was whether Missouri statutes "regulated" pricing practices within the title insurance industry. The court said that Missouri did so regulate the practice, noting "if the state statute generally regulates the pricing schedules and conduct of insurance companies, this suffices to exempt the insurance carriers so regulated from federal antitrust suits." *Id.* at 797 (citations omitted). While the court spoke in terms of a "general" regulatory presence, as in *National Casualty*, the court also determined that the specific regulation at issue addressed the very practices involved in the lawsuit. Both of these cases, I believe, focused narrowly upon the existence of regulation of the specific conduct at issue in the lawsuit, not upon a general state regulatory presence in the insurance industry. *See United States v. Crocker Nat'l Corp.*, 656 F.2d 428, 453 n. 85 (9th Cir.1981) (referring to *Lawyers Title* as representative of cases where the court "focused on whether the state regulated the specific conduct alleged to be in violation of the federal antitrust laws"), *rev'd on other grounds sub. nom. Bankamerica Corp. v. United States*, 462 U.S. 122, 103 S.Ct. 2266, 76 L.Ed.2d 456 (1983); *Crawford v. American Title Ins. Co.*, 518 F.2d 217 app., 218 (5th Cir.1975) (McCarran–Ferguson renders antitrust law inapplicable when state "generally proscribes, permits or otherwise regulates the conduct in question"). *Cf. Feinstein v. Nettleship Co.*, 714 F.2d 928, 932 (9th Cir.1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 820 (1984); *Klamath–Lake Pharmaceutical Ass'n v. Klamath Medical Serv. Bureau*, 701 F.2d 1276, 1287 n. 10 (9th Cir.) (distinguishing *Crocker Nation-*

*al*, the court found it was enough that a detailed overall scheme of regulation existed), *cert. denied*, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

In light of this standard, I believe the facts of this case compel a conclusion that the State of Minnesota did not "regulate" workers' compensation insurance pricing practices within the meaning of McCarran–Ferguson. Prior to 1979, Minnesota required all workers' compensation insurers to charge rates promulgated by the state rating bureau. In 1979, however, the state amended its statutes to provide for only a maximum rate—insurers were expressly permitted to charge rates below the maximum. *See* Minn.Stat. § 79.21 (1982). The undisputed purpose of this amendment was to deregulate the pricing of workers' compensation insurance and encourage competition among insurers at rates below the maximum. While other general pricing regulations were left in place, the matter of setting premiums to be charged was intentionally left to the discretion of insurers. *See* Addendum of State of Minnesota as Amicus Curiae at 31–32 (Affidavit of Michael Hatch, Commissioner of the Minnesota Department of Commerce).

Given Minnesota's intentional deregulation of workers' compensation rates, I would find that Minnesota does not "regulate" these rates for purposes of application of McCarran–Ferguson. While the state did maintain a general regulatory presence in the field, there was no specific regulation targeted at the alleged practices at issue in this lawsuit—price-fixing below the maximum allowable rate. To hold otherwise reaches a truly ironic result. If the amended statutory scheme is deemed to constitute "regulation" under McCarran–Ferguson, then the very statute intended to deregulate rates and encourage price competition would work to displace the obligation to compete imposed by federal antitrust laws. Such a result certainly was not intended by those who implemented the amended statute, nor is such a result consistent with the purpose of McCarran–Ferguson. Under the unusual facts presented here, neither Minnesota's more general

workers' compensation regulations, nor, as defendants also suggest, Minnesota's version of the Model Unfair Trade Practices in Insurance Act, sufficiently regulate acts of workers' compensation rate price fixing to satisfy the "state regulation" requirement of McCarran–Ferguson.

I would reverse the district court and find the McCarran–Ferguson Act inapplicable to plaintiffs' price-fixing claims because the practice is not "regulated" by the State of Minnesota as required by the Act.[2]

2. Given this conclusion, I would not reach the third requirement necessary for the McCarran– Ferguson exemption, that the conduct was not in the form of coercion, intimidation or boycott.